# MASTER TIME CHARTER AGREEMENT

This Master Time Charter Agreement (the "Agreement") is dated effective as of January 1, 2014 (the "Effective Date") and is by and between the following parties which may be referred to herein individually herein as a "Party" and together as the "Parties":

"Charterer"                 Fieldwood Energy LLC
                            One Briar Lake Plaza, Suite 1600
                            2000 West Sam Houston Parkway South.
                            Houston, Texas 77042
                            Attn: Purchasing Manager, Purchasing
                            Phone: (713) 969 1000
                            Fax:    (713) 969 1001

"Owner"                     Kilgore Marine Services, LLC
                            200 BEAULLIEU DR., BLDG. 8
                            Lafayette, LA 70508
                            Attention:
                            Telephone:
                            Facsimile:
                            Email:

A.      Charterer has acquired the Gulf of Mexico Shelf business unit from Apache Corporation and certain affiliates of Apache Corporation (collectively, "Apache").

B.      Owner is under contract with Apache under a master time charter agreement ("Prior Apache Agreement") to provide chartered vessels to Apache.

C.      Charterer requires Owner to enter into this Agreement to provide chartered vessels from time to time to Charterer beginning as of the effective date written above, and nothing herein replaces, supersedes, modifies, or amends the Prior Apache Agreement for vessels time chartered by Owner to Apache. Charterer is not a party to the Prior Apache Agreement and is not bound by its terms in any manner.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements as set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  CANCELLATION.  This Agreement shall control and govern each Short Form Time Charter Agreement ("Short Form", attached hereto as Exhibit A) entered into between the Parties.  Each Party may cancel this Agreement by providing thirty (30) days' prior written notice to the other Party, and at the time of such termination the applicable Short Form shall be terminated subject to the completion of the operation then in progress at the discretion of Charterer.

2.  CHARTER. This Agreement does not obligate Owner to charter its vessels to Charterer, nor does it obligate Charterer to hire any vessel or vessels owned, brokered, or chartered by

Exhibit A

Owner, but it, together with any Short Form between Owner and Charterer dated subsequent to the Effective Date, shall govern the respective rights and duties of Owner and Charterer with respect to the charter of Owner's vessel(s) by Charterer. Owner represents and warrants that it has authority to charter any vessels provided herein and under the Short Form except as set forth in Section 3(d). The term "vessel" as used herein shall mean any vessel type as may be provided by Owner and approved in writing by Charterer under this Agreement and/or a Short Form. This Agreement may <u>NOT</u> be used for a bareboat charter of Owner's vessels by Charterer. Such bareboat charter will be subject to a separate agreement entered into by the Parties.

## 3.  DELIVERY, REDELIVERY, SUBSTITUTION AND VESSEL CONDITION.

**a.**  Each vessel shall be delivered to Charterer at the time and place specified in the applicable Short Form. Each vessel shall be delivered and maintained in good running order and in a tight, staunch, strong and in all respects seaworthy condition. Each vessel shall have all documentation as required by the United States Coast Guard and all other applicable authorities and shall have a current class certificate from the American Bureau of Shipping (as applicable).

**b.**  Owner shall man the vessel at all times with a full complement of officers, crew, and personnel to properly man, navigate, operate, repair, supply, manage and maintain the vessel, as set forth in the Short Form. The selection and compensation of Owner's personnel shall be determined by Owner, provided that all personnel shall be duly and properly licensed, trained, qualified, competent, skilled, efficient and experienced in their respective capacities and shall comply with all applicable laws, rules and regulations in the operation of the vessel. Owner shall be responsible for all transportation of its personnel. Owner shall be solely responsible for all payments to its personnel, including compensation, social benefits, termination payments, employee benefits and any other payment required by applicable law, rule or regulation and, without limiting the risk allocation provisions of Section 12 which shall prevail over the obligations of this paragraph, **Owner shall defend, indemnify and hold the Charterer Indemnitees harmless from any Claims relating thereto or arising therefrom.**

**c.**  If the Parties, mutually agree, each vessel shall be surveyed before delivery and upon redelivery, by an independent surveyor mutually agreed upon by the Parties (in the event that the Parties do not agree on a surveyor, then the surveyor appointed by Charterer shall perform the survey); expenses of said surveys shall be divided equally between Charterer and Owner, unless otherwise agreed between the Parties. Owner shall be responsible for the operation, maintenance and repair of the vessel at all times. Subject to Section 16(a) herein, the vessel shall go off hire if any such operation, maintenance and/or repair shall require the withdrawal of the vessel.

**d.**  Owner may at any time substitute a suitable replacement vessel, subject to the written consent of Charterer and its underwriters' surveyors. Charterer shall not incur any additional fees, costs and/or expenses arising out of or related to the provision of such replacement vessel.

**e.**  For the use of the vessel on the Outer Continental Shelf of the Gulf of Mexico or otherwise as required by Charterer, Owner agrees that it has or will have, prior to providing any vessel under this Agreement and/or the Short Form, (i) complied with Charterer's Gulf of Mexico Contractor Safety Requirements, including, but not limited to, the applicable Data Integrity Security Administration (DISA) Compliance Program (the "DISA Compliance Program") for among, other things, contractor drug testing consortium, and the ISNetworld Health and Safety Review and Verification Program (the "ISNetworld Program", and

together with the DISA Compliance Program, the "Compliance Programs") and (ii) represents that all of Owner's, its contractors' and its subcontractors' personnel who perform any services under this Agreement and/or the Short Form have enrolled in the applicable DISA Compliance Program (whether DOT, non-DOT or both) and ISNetworld Program. Owner expressly acknowledges and agrees that (i) any failure to comply with the provisions of this Section 3(e) shall be cause for Charterer to immediately terminate this Agreement and/or any Short Form and, in such event, Owner shall solely be paid for such amounts as may be properly due for the provision of the applicable vessel up to the date of termination and (ii) the failure of any of Owner's, its contractors' and/or subcontractors' personnel to enroll or maintain its current enrollment in the applicable Compliance Programs shall require Owner to immediately remove such personnel from the applicable vessel and for such personnel to be excluded from the performance of services under this Agreement and/or any Short Form. Any replacement vessel provided under Section 3(d) and the personnel for such replacement vessel shall comply with the requirements set forth in this Section 3(e).

**f.**   Owner agrees to comply with Charterer's policies concerning health, safety, security, environmental and search and seizure. A copy of such policies shall be made available to Owner upon request.

**g.**   Redelivery may be postponed for the duration of any voyage or operation in progress at the expiration of the Short Form term and for any additional period reasonably necessary to effect redelivery. Charterer shall pay charter hire, at the applicable Short Form rate, for the entire period that redelivery is postponed or delayed, unless such postponement and/or delay is caused by Owner or a party acting on behalf of Owner or due to a total or constructive loss of the vessel for which Owner shall at all times be liable and responsible.

**h.**   Charterer shall pay Owner within thirty (30) days of delivery for all fuel, lube and water on board the vessel at the time of delivery. Owner shall pay Charterer within thirty (30) days of redelivery for all fuel, lube and water on board the vessel at the time of redelivery. The amounts shall be determined by the respective on and off-charter surveys. The prices for said fuel, lube and water shall be the prevailing price at the respective port at the time of delivery and redelivery.

## 4. CHARTER HIRE.

**a.**   Owner shall bill Charterer for each Short Form at the address specified on the first page hereof, or such other address as Charterer may from time to time designate in writing, at the end of each calendar month. Charterer shall pay owner all undisputed sums within such invoice within thirty (30) days after the receipt of Owner's invoice. Payment shall be made in U.S. Dollars to Owner, or its assigns, at either the address specified on the first page hereof or such other place as owner may designate in writing.

**b.**   If any vessel is lost (either constructive or total loss), payment of all undisputed amounts shall be made up to and including the date of the loss. If the time of loss is uncertain, then hire shall be payable up to and including the day such vessel was last heard from.

**c.**   Owner shall not pay any fee, commission, rebate, or other value to or for the benefit of any governmental official having jurisdiction over the vessel or work under this Agreement and/or any Short Form, if such payment would be inconsistent with or penalized by the laws and regulations of the United States. Owner shall not pay any commissions or fees or grant any rebates or other remuneration or gratuity to any person in connection with the provision of the vessel under this Agreement and/or any Short Form. Owner shall not accept any rebates nor accept any commissions or fees in connection with the provision of the vessel under this Agreement and/or any Short Form. **Owner shall defend, indemnify and hold the**

Charterer Indemnitees harmless from any Claims relating to or arising from any breach of this Section 4(c).

**d.** Except as otherwise specifically provided for herein, **Owner shall be responsible for and shall indemnify, defend and hold the Charterer Indemnitees harmless from and against any and all taxes levied against Owner arising out of or related to the provision of the vessel under this Agreement and/or any Short Form, including all (federal, state, and local) ad valorem, income or net worth, property, occupation, payroll, employment, first use, gross receipts, privilege, sales, use, consumption, excise, and other governmental charges, duties, tariffs, levies, licenses, fees, permits and assessments.**

5. **USE OF VESSEL.**

**a.** Charterer agrees to restrict the use of each vessel solely to the lawful movement of its supplies, equipment (including Charterer's and its contractor's vessels whether owned or chartered), and other materials and personnel incidental to its operations in the inland and offshore waters of the U.S. Gulf Coast, the Gulf of Mexico, and in waters where the vessel can be navigated and lie safely afloat. The whole of the vessels shall be at Charterer's disposal reserving proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, equipment, stores, and fuel. For reasons of safety, the vessel shall not be used for live diving (also known as live boating).

**b.** Charterer agrees to comply with all applicable laws, regulations and the vessel's U.S. Coast Guard Certificate of Inspection (COI) affecting the marine carriage and discharge of Noxious Liquid Substances (NLS) in bulk. Charterer may not load or cause to be loaded on the vessel any bulk NLS not authorized by the vessel's COI, except and to the extent permitted by Charterer's National Pollution Discharge permit. No discharge of NLS residue into the sea is permitted; and **Charterer agrees to indemnify, protect, defend and hold harmless Owner, the vessel, its registered owner, its master and crew, and their respective underwriters from and against the results of any breach by Charterer of the aforesaid discharge prohibition.** Owner shall be responsible for compliance with the regulations set forth in 33 Code of Federal Regulations parts 154, 155 and 156, including, reporting spills of diesel or other substances contained in the hull of the vessel and initiating spill response and containment as required. Owner will not be required to clean the vessel's bulk tanks, and Charterer shall at its own expense, arrange for the cleaning of such tanks and for the removal and legal disposal of the resulting residues arising solely out of the Charterer's use of such tanks. Charterer agrees to properly manifest all hazardous wastes and NLS wastes carried aboard the vessel by or on behalf of Charterer and to comply with all paperwork requirements imposed by law as a result of such carriage.

**c.** The master of each vessel shall determine whether operations requested by the Charterer can safely be undertaken and whether his vessel is capable of undertaking or being employed to carry out the directions and orders of the Charterer. Subject to the foregoing, the master, although appointed by the Owner, shall be under the general direction of the Charterer as regards employment of the vessel, agencies, or other arrangements, and shall not unreasonably refuse any request to undertake operations or carry out any order or direction specified by Charterer. From time to time, Charterer shall furnish the master of the vessel with all requisite instructions and sailing directions, and the master shall keep full and correct logs of the voyages. These shall be made available within a reasonable time upon the request of Charterer.

**d.** Notwithstanding anything to the contrary in this Agreement, it is agreed that if any operation, voyage, movement, activity, or inactivity on the part of Owner and/or the master is insisted upon by Charterer, its agents, employees, or representatives and undertaken by the

master of the vessel under protest, on account of the opinion of the master that said operation, voyage, movement, activity, or inactivity is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, the responsibility for any such loss, damage or expense, loss of life or personal injury shall thereupon rest solely upon Charterer.

**e.** Charterer, its affiliates, contractors and their respective representatives and employees shall at all times be allowed on board the vessel (subject to available capacity), but the presence of any of the foregoing shall not relieve the Owner of its obligations under this Agreement and/or any Short Form.

6. **NON-CREWMEMBER SUBSISTENCE.** Food and bunking facilities, if any, for any of Charterer's personnel shall be provided by Owner, subject to reimbursement by Charterer, at the rate specified in the Short Form. Charterer shall not be responsible for reimbursement for food and bunking facilities for crewmembers of the vessel.

7. **DUTIES OF MASTER AND CREW.**
   **a.** Owner shall provide and pay for a full complement of master, officers and crew for each vessel in accordance with the vessel's class, tonnage and applicable U.S. Coast Guard regulations. Any additional personnel for the vessel shall be provided in accordance with the Short Form but subject to the requirements of this Agreement. The master shall prosecute the voyage with dispatch in a safe manner and shall render all reasonable assistance with the vessel's crew and equipment. The duties of the crew provided by Owner shall be limited to the maintenance and navigation of the vessel, and local unions or labor regulations permitting, the loading and discharging of bulk cargoes laden aboard the vessel.
   **b.** If the Charterer shall have reason to be dissatisfied with the conduct of the master, officers or any other member of the crew, the Owner shall, on receiving particulars of the complaint, replace such member of the crew providing services contracted for herein.
   **c.** In all cases where Owner's employees (defined for the purposes of this Section 7(c) to include any of Owner Group's direct, borrowed, special or statutory employees) are performing work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., Owner and Charterer acknowledge and agree that all work and operations performed by Owner and its subcontractors and their employees pursuant to this Agreement are an integral part of and are essential to the ability of Charterer to generate Charterer's goods, products or services. In such event, and without limiting the provisions of Section 12 herein, Owner and Charterer agree that Charterer is and shall be deemed a statutory employer of Owner's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

8. **ADDITIONAL EQUIPMENT.** Charterer may install additional equipment aboard each vessel reasonably necessary in connection with its operations, provided that Charterer shall obtain the written consent of Owner before making any structural changes or modifications (such consent not to be unreasonably withheld or delayed) and provided that said installation shall be approved by the American Bureau of Shipping and/or the United States Coast Guard, when applicable. All equipment installed by Charterer shall remain its property and shall be removed prior to redelivery, provided each vessel is restored to the same condition as it was prior to the installation of equipment or structural change, ordinary wear and tear excepted, all at Charterer's expense. Vessel shall remain on-hire at that rate set forth in the applicable Short Form during any period of said installation, removal and/or modifications, unless such

installation, removal and/or modifications are performed during such times as the vessel is undergoing other modifications, repairs and/or inspections.

9. **CHARTERER TO PROVIDE.** Charterer agrees to and shall provide and/or pay for:

a. Necessary dunnage, uprights and shoring equipment for securing deck cargo; oil, and fresh water; replacement bulk cargo hoses; and loading and discharging of all cargoes except as provided in Section 7 herein; provided that Charterer, at its option, may direct Owner to procure any or all of the above subject to reimbursement by Charterer for the costs plus ten percent (10%) for handling.

b. All permits, clearance expenses, customs fees and duties (import or otherwise), pilotage fees, wharfage, port charges, canal fees, dockage, safe berths, watchmen, fumigation, extermination and cleaning of cargo tanks, waste oil disposal and all costs incident to any of the above (except to the extent any such fees, duties or costs are incurred by reason of delay or fault on the part of the Owner or any of its crewmembers), and any taxes arising out of any such fees, duties and costs in this Section 9(b), except income taxes, including income taxes imposed on Owner by the country or registry of the vessel and income taxes imposed on Owner by any nation in which the vessel is required to work for which Owner shall remain responsible. Subject to Section 4(c) herein, Owner shall be responsible for any agency fees and commissions relating to or arising out of the vessels.

c. All expenses and costs under Sections 9(a) and/or (b) herein shall be subject to the prior written approval of Charterer.

10. **OWNER'S INSURANCE.** Owner agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this Agreement, and with reliable insurance companies, the following insurance coverages:

a. Worker's Compensation and Employers' Liability Insurance, in accordance with all applicable state, Federal, and Maritime laws endorsed specifically to include the following:

i. Longshoremen's and Harbor Worker's Act, and including its extension by the Outer Continental Shelf Lands Act.

ii. Masters and members of the Crews of Vessels (on a Voluntary Compensation Basis) with limits of liability of not less than $1,000,000 per injury or death occurrence of any one employee and not less than $5,000,000 per injury or death occurrence of more than one employee resulting from any one accident. Coverage shall also include transportation, wages, maintenance, and cure.

iii. "In rem" endorsement, stating that an action "in rem" shall be treated as a claim against the insured "in personam."

iv. "Borrowed servant" endorsement, stating that a claim brought against the Charterer for compensation as a "borrowed servant" by an employee of Owner will be treated as a claim against Owner.

b. Commercial General Liability Insurance, including coverage for Contractual Liability covering Owner's obligations under this Agreement with limits of liability for bodily injury and for property damage of not less than $1,000,000 per occurrence. Such insurance shall include the following:

i. Territorial extension to include the entire Gulf of Mexico without mileage limitation, including, but not limited to, state, federal (including the Outer Continental Shelf) and international waters.

ii. "In rem" endorsement, stating that an action "in rem" shall be treated as a claim against the insured "in personam."

**iii.** Removal of the "watercraft" exclusion from the Liability Policy, including the contractual coverage.

**iv.** Removal of "Professional Services" exclusion.

**c.** Hull and Machinery Insurance, covering each vessel owned or chartered by Owner in connection with the operations under this Agreement, to the actual value of each vessel and its equipment. If any vessel shall engage in towing operations, said insurance shall include full Towers Liability with the sistership clause unamended.

**d.** Protection and Indemnity Insurance, with limits at least equal to the value of each vessel owned or chartered, (including Towers Liability, where applicable) but in no event less than $1,000,000. Such coverage shall include coverage for the Charterer's crews unless this is provided separately under such coverage for Charterer's crews is provided in accordance with Section 10(a) above. The "Watercraft" exclusion deleted from the Liability Policy in accordance with Subparagraph 10(b) above.

**e.** Aircraft Liability Insurance, for operations requiring the furnishing of aircraft by Owner, including helicopters, with a combined single limit for public liability, passenger liability, and property damage liability in an amount of not less than $5,000,000: Such insurance shall cover all owned and non-owned aircraft, including helicopters, furnished by Owner in connection with the performance of the work set forth in this contract.

**f.** Excess Liability Insurance, with limits of liability for bodily injury, property damage, pollution and contamination of not less than $20,000,000 per occurrence providing coverage excess of the insurances required in Sections 10(a), 10(b), 10(d) and 10(e). It is hereby agreed by the Owner that should the excess liability insurance coverage in Owner's insurance policies purport to limit Charterer Indemnitees's coverage to any minimum limits or coverage amounts required by written contract, then the minimum limits and/or coverage required in this Agreement shall automatically be amended to the maximum limits and coverage in Owner's insurance policies.

**NOTE:** All policies of insurance required hereunder shall contain navigation and/or territorial limits adequate for the performance of the work hereunder. Policies covering vessel and marine exposures shall include provisions deleting any "As Owner" and Limitation of Liabilities language with respect to Charterer. With respect to the obligations assumed by Owner under the indemnity and insurance provisions of this Agreement, neither Owner nor its insurers shall attempt to limit their obligations by asserting any right to claim Limitation of Liability provided by any presently existing or future statute of the United States or any other jurisdiction. All polices of insurance required herein (except for worker's compensation insurance required in Section 10(a) herein) shall include the Charterer Group as additional insureds but only for and to the extent of the indemnities and liabilities assumed by Owner herein. Underwriters of all policies of insurance required hereunder shall waive their rights of subrogation against the Charterer Group but only for and to the extent of the indemnities and liabilities assumed by Owner herein. All deductibles and self-insured retentions under Owner's insurance policies specified above shall be for the account of Owner. It is hereby agreed by the Owner that should the additional insured endorsement(s) in Owner's insurance policies purport to limit Owner Group's coverage to any minimum limits or coverage amounts required by written contract, then the minimum limits and/or coverage required in this Agreement shall automatically be amended to the maximum limits and coverage in Owner's insurance policies.

It is expressly understood and agreed that the insurance coverage required hereunder represents Owner's minimum insurance requirements and are not to be construed to fund or limit the liability or any indemnity obligation undertaken by Owner in this Agreement.

Commencement of any services pursuant to this Agreement is conditioned upon Owner securing and delivering to Charterer a certificate of insurance evidencing that the foregoing insurance is in full force and effect and that a minimum of thirty (30) days written notice of material change or cancellation shall be provided to Charterer.

The insurance coverages required herein must also include a broad form contractual liability coverage endorsement for Owner's liability assumed under this Agreement, without restriction and without being restricted (i) to "ongoing operations", (ii) to coverage for vicarious liability or (iii) to circumstances in which the named insured is partially negligent. Only for and to the extent of to the indemnities and liabilities assumed by Owner herein, the insurance policies required under this Agreement and any other property, casualty or liability insurance policies of Owner in any way providing coverage related to this Agreement, whether or not such policies are required by this Agreement, are to be endorsed to delete the "other insurance" provision of Owner's insurance policies and to provide that all of Owner's policies are to be primary insurance.

The additional insured, waiver of subrogation and primary insurance requirements as set forth herein shall apply and have full force and effect to any self-insurance, self-insured retentions and deductibles carried by Owner as part of the insurance requirements set forth herein.

**11.  CHARTERER'S INSURANCE.**  Charterer agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this Agreement, and with reliable insurance companies or through self-insurance, the following coverages:
> **a.** Commercial General Liability Insurance, including coverage for Contractual Liability, covering Charterer's obligations under this Agreement, and removal of the "watercraft" exclusion, with limits of $5,000,000 per occurrence.
> **b.** Workers' Compensation and Employers' Liability Insurance in accordance with all applicable state, Federal, and Maritime laws with a minimum limit of $1,000,000 per occurrence for Employer's Liability.
> **c.** All deductibles under the foregoing insurances shall be for the account of Charterer. The Commercial General Liability Insurance policy shall name Owner Group as additional insureds but only for and to the extent of the indemnities and liabilities assumed by Charterer hereunder. The underwriters of all insurance policies required of Charterer hereunder shall waive their rights of subrogation against Owner Group and their respective insurers but only for and to the extent of the indemnities and liabilities assumed by Charterer hereunder. Only for and to the extent of to the indemnities and liabilities assumed by Charterer herein, the insurance policies required under this Agreement and any other property, casualty or liability insurance policies of Charterer in any way providing coverage related to this Agreement, whether or not such policies are required by this Agreement, are to be endorsed to delete the "other insurance" provision of Charterer's insurance policies and to provide that all of Charterer's policies are to be primary insurance.

Notwithstanding any other provision herein, the parties expressly agree that the additional insured, waivers of subrogation, and primary insurance which each Party (the "Insuring Party") obtains for the other Party and their Group (the "Insured Parties") shall

apply only for and to the extent of the liabilities (i.e., the release, defense and indemnity obligations) expressly assumed by the Insuring Party, and shall not offer protection to the Insured Parties for any liabilities assumed by the Insured Parties in this or any other agreement. For avoidance of doubt, the Parties agree that the insurance requirements herein, including additional insured, primary insurance, and waiver of subrogation requirements, shall not prime, supersede, or limit the Parties' and the Insured Parties' respective release, defense and indemnity obligations.

12. **INDEMNITIES.**

   a. **Definitions.** As used in this Agreement, the following terms shall have the meanings ascribed to them below unless the context clearly and unambiguously requires that such terms be given a different meaning:

      (i) "Claims" shall mean any claims, demands, complaints, losses, fines, penalties, citations, damages, cause of action, suits, judgments, orders, expenses or costs, including, without limitation, court costs, reasonable attorneys' fees and expert witnesses' fees.

      (ii) "Charterer Group" shall mean Charterer and its parent, affiliates and subsidiary companies, co-lessees, co-owners, partners, joint venturers, together with its and all of their respective officers, directors, employees, in-house legal counsel, agents, representatives, insurers and invitees of all of the foregoing and the respective successors, spouses, relatives, dependents, heirs and estate of any of the foregoing.

      (iii) "Owner Group" shall mean Owner and its parent, affiliates and subsidiary companies, the vessel and its owners and operators, and its and their respective subcontractors of any tier, together with its and all of their respective officers, directors, employees, masters, operators, crew members, in-house legal counsel, agents, representatives, insurers and invitees and the respective successors, spouses, relatives, dependents, heirs and estate of any of the foregoing.

      (iv) "Group" shall mean the Charterer Group, the Owner Group, or both, as the context requires.

      (v) "Third Party Contractor" shall mean any other contractor or subcontractor of any tier (other than any member of Owner Group) used or employed by Charterer to provide equipment or services to Charterer.

      (vi) "Third Party Contractor Group" means shall mean Third Party Contractor and its parent, affiliates and subsidiary companies, its and their respective subcontractors of any tier, together with its and all of their respective officers, directors, employees, in-house legal counsel, agents, representatives, insurers and invitees and the respective successors, spouses, relatives, dependents, heirs and estate of any of the foregoing.

   b. **GENERAL INDEMNITIES BETWEEN CHARTERER AND OWNER.**

      (i) OWNER HEREBY AGREES TO RELEASE, INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS CHARTERER GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF OR

RELATED TO (1) THE INJURY, ILLNESS OR DEATH OF ANY MEMBER OF OWNER GROUP AND/OR (2) THE LOSS, DAMAGE, DESTRUCTION AND/OR WRECK AND DEBRIS REMOVAL OF ANY PROPERTY BELONGING TO ANY MEMBER OF OWNER GROUP, WITHOUT REGARD TO WHETHER ANY SUCH INJURY, ILLNESS, DEATH, LOSS, DAMAGE, DESTRUCTION, WRECK AND/OR DEBRIS REMOVAL IS CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT; ACTIVE OR PASSIVE), STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY, BREACH OF WARRANTY OR OTHER FAULT (EXCLUDING ONLY THE GROSS NEGLIGENCE AND INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE CHARTERER GROUP OR BY ANY DEFECT OR PRE-EXISTING CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT, LATENT OR OTHERWISE) OR UNSEAWORTHINESS OF THE VESSEL.

(ii) CHARTERER HEREBY AGREES TO RELEASE, INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS OWNER GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF OR RELATED TO (1) THE INJURY, ILLNESS OR DEATH OF ANY MEMBER OF CHARTERER GROUP AND/OR (2) THE LOSS, DAMAGE OR DESTRUCTION AND/OR WRECK AND DEBRIS REMOVAL OF ANY PROPERTY BELONGING TO ANY MEMBER OF CHARTERER GROUP, WITHOUT REGARD TO WHETHER ANY SUCH INJURY, ILLNESS, DEATH, LOSS, DAMAGE, DESTRUCTION, WRECK AND/OR DEBRIS REMOVAL IS CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT; ACTIVE OR PASSIVE), STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY, BREACH OF WARRANTY OR OTHER FAULT (EXCLUDING ONLY THE GROSS NEGLIGENCE AND INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE OWNER GROUP OR BY ANY DEFECT OR PRE-EXISTING CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT, LATENT OR OTHERWISE) OR UNSEAWORTHINESS OF THE VESSEL.

c.  OWNER SHALL RELEASE, INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS CHARTERER GROUP FROM AND AGAINST ANY AND ALL CLAIMS BY ANY THIRD PARTY OR GOVERNMENT ENTITY INVOLVING BODILY INJURY OR LOSS, DAMAGE OR DESTRUCTION TO PROPERTY RESULTING FROM THE NEGLIGENCE (BUT ONLY TO THE EXTENT OF OWNER'S NEGLIGENCE IF CHARTERER IS DETERMINED TO BE JOINTLY OR CONCURRENTLY NEGLIGENT), INTENTIONAL ACT, OR STRICT LIABILITY OF OWNER WHILE PERFORMING THE WORK HEREUNDER.

d.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, OWNER SHALL DEFEND, INDEMNIFY AND HOLD CHARTERER GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS FOR DAMAGE TO AND/OR LOSS OF THE DRILLING UNIT(S) OF CHARTERER'S DRILLING CONTRACTORS CAUSED BY ANY VESSEL PROVIDED UNDER THIS AGREEMENT AND THE APPLICABLE SHORT FORM TO THE EXTENT THAT CHARTERER IS REQUIRED TO DEFEND,

**INDEMNIFY, PROTECT AND/OR HOLD HARMLESS ITS DRILLING RIG CONTRACTORS AND/OR ANY OTHER PARTY AS SET FORTH IN THE APPLICABLE CONTRACT BETWEEN CHARTERER AND SUCH DRILLING RIG CONTRACTOR FOR SUCH DAMAGE TO AND/OR LOSS OF THE DRILLING UNIT.**

e. Notwithstanding anything contained hereunder to the contrary, in the event that an injury or accident giving rise to a Claim which is subject to the laws of any jurisdiction that prohibits or limits the Parties' ability provide the indemnity set forth above, including, but not limited to, Chapter 127, Texas Civil Practice & Remedies Code (as the same may be amended from time to time), then, if such law must be applied, the indemnifying Party's obligations shall exist to the full extent allowed by the law of such jurisdiction; and such indemnifying Party voluntarily agrees to carry the maximum amount of insurance which may be allowed or requested by the law of such jurisdiction for the protection of the indemnified Parties against such loss or liability. The Parties agree that their respective indemnity obligations hereunder are independent of any insurance which such Parties may be required to carry hereunder.

f. Any indemnified Party under this Section 12 shall have the right to participate at its own expense, with attorneys of its choice, in the defense of any Claim for which it has rights to indemnity pursuant to this Section without releasing the indemnifying Party from any of its indemnity obligations hereunder; provided, however, that the indemnifying Party shall have the exclusive control of the defense and settlement of any such Claim; provided, further that the indemnifying Party shall not have the right to settle any Claim for any resolution other than the payment of money without the indemnified Party's express, written consent.

g. **CROSS INDEMNITIES BETWEEN OWNER AND CHARTERER'S OTHER THIRD PARTY CONTRACTORS.**
   (i) **TO THE EXTENT CHARTERER'S THIRD PARTY CONTRACTORS EXECUTE CROSS INDEMNIFICATION AND WAIVERS SUBSTANTIALLY SIMILAR TO THOSE CONTAINED IN THIS SECTION 12(f), OWNER HEREBY AGREES TO RELEASE, INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS SUCH OTHER THIRD PARTY CONTRACTORS (AND ANY SUCH THIRD PARTY CONTRACTOR GROUP) FROM AND AGAINST ANY AND ALL CLAIMS FOR (1) THE INJURY, ILLNESS OR DEATH OF ANY MEMBER OF OWNER GROUP AND/OR (2) THE LOSS, DAMAGE, DESTRUCTION AND/OR WRECK AND DEBRIS REMOVAL OF ANY PROPERTY BELONGING TO ANY MEMBER OF OWNER GROUP, WITHOUT REGARD TO WHETHER ANY SUCH CLAIM IS CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT; ACTIVE OR PASSIVE), STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT (EXCLUDING ONLY THE GROSS NEGLIGENCE AND INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE THIRD PARTY CONTRACTOR GROUP OR BY ANY DEFECT OR PRE-EXISTING CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT, LATENT OR OTHERWISE).**

(ii) Owner agrees that it will support its mutual indemnity obligations of this Section 12(f) with insurance with the minimum limits not less than those set forth in Section 10 obtained for the benefit of such Third Party Contractors (and any such Third Party Contractor Group) but such minimum insurance requirements shall not limit Owner's indemnity obligations except to the extent mandated by law.

(iii) The Parties intend to create a third party beneficiary obligation of Owner in favor of such other Third Party Contractor (and any such Third Party Contractor Group) that have included reciprocal cross indemnity, insurance support and waiver provisions in their respective contracts with Charterer (and to extent such third party beneficiary obligation of Owner to such other Third Party Contractor Group).

(iv) Notwithstanding any other provision herein, the Parties expressly agree that:  (a) this Agreement and all cross indemnification and waiver obligations under this Section 12(f) arise out of the provision of the maritime services of Owner, and all cross indemnification and waiver obligations of Owner under this Section 12(f) and reciprocal cross indemnification and waiver obligations of Third Party Contractor and Third Party Contractor Group under any other contract shall be governed by the General Maritime Laws of the United States; and (b) Owner would not have granted the cross indemnification and waiver obligations of this Section 12(f) in favor of Third Party Contractors but for the reciprocal cross indemnification and waivers from the respective Third Party Contractors in their respective agreements with Charterer.

(v) Except as part of a Claim for which Owner is indemnified from a Third Party Contractor under reciprocal cross indemnity and waiver provisions pursuant to this Section 12(f), Owner further agrees to waive any Claims against such Third Party Contractor(s) (and any member of such Third Party Contractor Group's own consequential, special, indirect, incidental, exemplary or punitive damages, including without limitation, loss of profits, loss of business opportunity or loss of prospective revenue, arising out of this Contract or any Work performed by, or to be performed by, such Third Party Owner, or any member of such Third Party Owner Group.

h.   In the event Charterer does not have in place reciprocal indemnification and waivers from a Third Party Contractor substantially similar to those contained in this Section 12(f), Owner's cross indemnification under this Section 12(f) shall not apply only with respect to that specific Third Party Contractor (and any member of its Third Party Contractor Group), and that specific Third Party Contractor (and its Third Party Contractor Group) shall be considered part of the definition of Charterer Group solely for the purposes of Section 12.b.(ii).

WITH RESPECT TO THIS AGREEMENT, BOTH PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIRMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT <u>THIS AGREEMENT HAS PROVISIONS REQUIRING ONE PARTY (THE INDEMNITOR) TO BE</u>

RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (THE INDEMNITEE). CHARTERER AND OWNER UNDERSTAND THAT IN THIS AGREEMENT EACH PARTY IS SOMETIMES AN INDEMNIFYING PARTY AND SOMETIMES AN INDEMNIFIED PARTY. EACH INDEMNIFYING PARTY REPRESENTS TO THE INDEMNIFIED PARTY (1) THAT IT, THE INDEMNIFYING PARTY, HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF IT HAS NOT CONSULTED AN ATTORNEY, THAT IT WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO SO CONSULT BUT MADE AN INFORMED DECISION NOT TO DO SO, AND (2) THAT IT, THE INDEMNIFYING PARTY, FULLY UNDERSTANDS ITS OBLIGATIONS UNDER THIS AGREEMENT.

13. **PRIORITY OF INDEMNITY OBLIGATIONS.** In the event that Charterer has agreed to release, protect, defend, indemnify, or hold harmless any person or entity for a Claim for which Owner has also agreed to release, protect, defend, indemnify, or hold harmless such person or entity, Owner's obligation to release, protect, defend, indemnify, or hold harmless such person or entity shall supersede and be primary to any such obligation on the part of Charterer; Owner shall not be entitled to indemnity or contribution from Charterer for any such obligation, and Charterer shall be entitled to indemnity from Owner for any liability incurred by Charterer in the event Owner fails to fulfill completely its release, protect, defend, indemnify, and hold harmless obligations.

14. **CONSEQUENTIAL DAMAGES. NOTWITHSTANDING ANY PROVISION TO THE CONTRARY, EACH PARTY HERETO SHALL BE LIABLE AND RESPONSIBLE FOR, AND SHALL RELEASE THE OTHER PARTY AND ITS RESPECTIVE GROUP FROM, ITS OWN SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWSOEVER THE SAME MAY BE CAUSED, AND WITHOUT REGARD TO WHETHER ANY SUCH DAMAGES ARE CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT; ACTIVE OR PASSIVE), STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY, BREACH OF WARRANTY OR OTHER FAULT (EXCLUDING ONLY THE GROSS NEGLIGENCE AND INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE OWNER GROUP OR CHARTERER GROUP OR BY ANY DEFECT OR PRE-EXISTING CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT, LATENT OR OTHERWISE) OR UNSEAWORTHINESS OF THE VESSEL.**

15. **FREEDOM FROM PATENT INFRINGEMENT.** Owner represents and warrants that the performance of work by Owner hereunder and/or any applicable Short Form shall not infringe on any license or patent which has been issued or applied for. In additional to all other indemnity provisions contained herein, **Owner shall release, indemnify, protect, defend and hold harmless Charterer Indemnitees from and against any and all Claims made by or arising in favor of any patentee, licensee or claimant of any right or priority in connection with the work performed by Owner hereunder and/or any applicable Short Form.** This Agreement shall be considered a "work for hire" for any patent or license received out of the performance of the work hereunder and/or any applicable Short Form.

**16. OFF HIRE.**
    **a.** Should the vessel, for reasons not directly caused by Charterer Group, break down, become inoperative, or unavailable to Charterer (which shall not be deemed to include periods where either the vessel is standing by awaiting instructions from Charterer, or repairs and maintenance can be performed without interfering with the operating requirements of Charterer) for more than twenty-four (24) hours in any one calendar month, payment of hire shall cease for all time in excess of said period. Such twenty-four (24) hour period or any part thereof shall not be accumulated or transferred to a succeeding month.
    **b.** Owner's liability to Charterer as a result of the vessel breaking down or becoming inoperative shall be limited solely to the cessation of charter hire as set forth above in this Section 16.

**17. LIENS.** Charterer shall not create or incur any liens to be imposed upon any vessel chartered under this Agreement. Owner agrees to indemnify and hold harmless Charterer of and from all liens created and imposed on the vessel by Owner (except such liens as might arise out of the obligations imposed herein on Charterer) as a result of operating the vessel under this Agreement.

**18. FORCE MAJEURE.** Neither Owner, Charterer, the vessel, nor their owners, operators, managers, employees or agents shall be liable under this Agreement for any loss, damage, or delay of whatsoever nature resulting from an event of Force Majeure. An event of "Force Majeure" shall mean an act of God, named or numbered tropical storms, hurricanes, enemy, strikes, labor disputes, hostilities, war, epidemic, quarantine, embargo, inability to obtain any permit necessary for the work, a stop work order, or for restraint of any government, rulers or people, or other causes beyond the control of the Parties hereto.

**19. FAILURE TO PERFORM.** If, at any time during the term of this Agreement, a Party fails to perform any of its duties or obligations imposed under this Agreement and/or any Short Form (except by reason of Force Majeure), or if a Party is dissolved or adjudged as bankrupt or has a petition in bankruptcy filed against it, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for a Party and such condition remains uncured for a period of ten (10) days, the other Party may, without prejudice to any other rights which it may have under this Agreement or any Short Form, terminate this Agreement, and in the case of the Charterer's default, the Owner withdraw and retake all vessels, wherever the same be found, without prior demand and without legal process, and for that purpose may enter upon any dock, pier, or other premises where any vessel may be found and take possession thereof.

**20. DISTRESS ASSISTANCE.** The vessel shall be entitled to assist vessels and other property in distress and to deviate for the purpose of saving life or property when necessary at the direction of the master of the vessel. All salvage and assistance to other vessels shall be for Owner's and Charterer's equal benefit after deducting the share allocated by law to the Master, officers and crew, legal expenses, and any other costs, expenses and lost time incurred by Charterer. In the event that the master of the vessel takes on any assistance effort as set forth in this Section 20, charter hire shall not be due to Owner during the time period of such effort. Except as set forth in this Section 20, the vessel shall not deviate from the operation under this Agreement and the applicable Short Form for towage, removal of wreck and/or property or any other operation.

21. **ASSIGNMENT.** Neither Owner nor Charterer shall assign this Agreement without prior written consent of the other, which consent shall not be unreasonably withheld or delayed; provided, however, such consent shall not be required in the event of an assignment to an affiliate or in the event of a merger, consolidation or sale of all or substantially all of a Party's assets in the area of operation under this Agreement. However, no such assignment shall relieve the assigning Party from any of its obligations hereunder incurred prior to the effective date of such assignment as set forth in a written notice to the other Party, unless otherwise agreed in writing.

22. **NATURE OF CHARTER.** Nothing herein contained shall be construed as creating a demise of the vessel to the Charterer, nor shall this Agreement apply to the bareboat charter of any barge or other vessel from Owner by Charterer. If a bareboat charter is desired for any barge or other vessel, such will be covered by a separate agreement.

23. **NOTICES.** The address of notice for the Parties hereto shall be provided for on the first page of this Agreement. A Party may change its address for notice by notifying the other Party in writing of its new address. If any Party changes its name, it shall notify the other in writing at its address for notice within thirty (30) days of effective date of change.

24. **INCIDENT REPORTS.** Owner shall furnish to Charterer, by electronic mail communication to the designated representative of Charterer, a complete copy of all incident reports within twenty-four (24) hours of the occurrence of the incident or earlier if reasonably possible. This requirement also applies to reports of first aid incidents. Charterer shall have the right to conduct a separate investigation into the incident and Owner agrees to cooperate fully with Charterer's investigation.

25. **LAW.** This Agreement shall be governed by and construed and the relations between the Parties determined in accordance with the general maritime law of the United States, not including any of its conflicts of law rules which would direct or refer to the laws of another jurisdiction. In the event that the general maritime law of the United States is determined by a court of competent jurisdiction not to be applicable, then the parties agree and stipulate that this contract and the relationship of the Parties shall be governed by and construed and the relations between the Parties determined in accordance with the laws of the State of Texas, not including, however, its conflicts of law rules which might otherwise refer to the law of another forum or jurisdiction; provided, however, that no law, theory or policy shall be given effect which would undermine, diminish or reduce the effectiveness of the waiver of damages provided in Section 14 herein, it being the express intent, understanding and agreement of the Parties that such waiver is to be given the fullest effect, notwithstanding the negligence (whether sole, joint or concurrent), gross negligence, willful misconduct, strict liability or other legal fault of a Party hereto.

26. **HEADINGS.** The preceding headings in this Agreement are for identification purposes only and are not intended to delineate the obligations or rights of the Parties to this Agreement.

27. **SEVERABILITY.** The provisions of this Agreement are separable and severable. If any provision, item or application of this Agreement shall be deemed invalid in whole or in part, such invalidity shall not affect other provisions, items or applications of this Agreement which can be given effect without the invalid provision, item or application.

28. **AUDIT.**  Owner shall retain all pertinent books, payrolls, and records relating to the charter for a period of twenty-four (24) months following the end of the year in which the applicable charges were made under this Agreement, and representatives of Charterer shall at all times during regular business hours, upon reasonable notice, have access to and the right to audit the books, payroll, and records maintained by Owner relating to any of the services under this Agreement.

29. **CONFIDENTIALITY.**  Owner shall treat and shall cause all members of Owner Group to treat, all information and data relating to Charterer and/or its operations (including the work of any of its contractors or subcontractors) obtained under this Agreement and/or any Short Form, as confidential, and Owner shall not, and shall cause all members of Owner Group to not, divulge any such information or data to any person or entity without the express, prior written consent of Charterer.  The Owner shall make no press release or other public announcement or public disclosure containing any reference, either directly or by implication, to this Agreement and/or the Short Form or the transactions contemplated thereby, unless the same has been approved in writing by Charterer.  Owner may not photograph or otherwise any of Charterer's facilities unless directed by Charterer, and Owner will instruct its employees and subcontractors not to photograph or record any of Charterer's facilities unless prior written permission to do so is obtained from Charterer.

30. **MERGER CLAUSE.**  This Agreement and the applicable Short Form comprises the full and complete agreement of the Parties hereto with respect to the matters set forth herein and supersedes and cancels all prior communications, understandings and agreements between the Parties hereto relating to the matters set forth herein, whether written or oral, expressed or implied.  In the event of any conflict between this Agreement and the Short Form, this Agreement shall control and govern in all circumstances.

*(Signature page follows)*

## EXHIBIT A MASTER TIME CHARTER AGREEMENT
### -SCHEDULE OF RATES-
### VESSEL QUOTATION

Reference is hereby made to that certain Master Time Charter by and between Fieldwood Energy LLC, as Charterer, and _____, as Owner, dated effective as of November 1, 2013 (the "Agreement"). All terms and conditions of the Agreement are applicable to this Short Form. In the event of any conflict between the Agreement and this Short Form, the Agreement shall control and govern in all circumstances.

A.  Term of Charter:  **From** _____  **To** _____

B.  Place of Delivery:  _____

    Time of Delivery:  _____

C.  Proposed Vessel, Size and Crane Capacity

    Name: _____  Class: _____

    Crane Size: _____  Boom Length: _____

    _____  Boom Length: _____

    Available Deck Space: _____  Square Feet

    Living Quarter Capacity: _____  Crew Plus _____  People

    Charge per 24 hour day  $ _____

D.  Mobilization and demobilization  $ _____

E.  Subsistence (Marine) per day, per person  $ _____

F.  Casual meals and lodging for personnel quartered or not quartered on the Vessel will be billed at an additional charge of $ _____ per meal per person and $ _____ per bunk per person per night.

G.  Charterer will provide the following:
1.  Dock-to-Dock Fuel:  Starting Fuel: _____ Gal.  Ending Fuel: _____ Gal.
2.  Potable Water
3.  Cordage / when used for onsite mooring purposes only
4.  Any modification or rentals / as authorized by Charterer
5.  Lubricants / disposal (waste oil)

H.  Other Charges:
    _____  $ _____
    _____  $ _____
    _____  $ _____

### SCOPE OF WORK

OWNER shall perform the following Work:

_____

_____

_____

CHARTERER:  FIELDWOOD ENERGY LLC  OWNER: _____

By: _____  By: _____

Date: _____  Date: _____

Exhibit B to Master Time Charter Contract

## "EXHIBIT A" MASTER TIME CHARTER
### -RELEASE OF VESSEL-

**CHARTERER:** FIELDWOOD ENERGY LLC          **OWNER:** _____

By: _____          By: _____

Date: _____          Date: _____

Time: _____          Time: _____

Prepared By: _____

*Note to Owner:*
Upon completion of vessel information and signature, submit to Charterer's representative as instructed for final signature. Such Charter representative will sign and return for your records. Please maintain in your active file until part two of this form is complete (Release of Vessel). Repeat the same process for release as you did on Charter.

### *The following to be completed by Charterer Representative:*

Vessel Evaluation (please rate by 1 to 5, 5 being highest).

| Performance: | Excellent | | Fair | | Poor | |
|---|---|---|---|---|---|---|
| Condition: | Excellent | | Fair | | Poor | |
| Safety: | Excellent | | Fair | | Poor | |
| Value for Price: | Excellent | | Fair | | Poor | |

**Comments:** _____

_____

_____

_____

_____

_____

_____

_____

_____

**Vessel report card will be completed and made available for Charterer's representatives to best evaluate equipment needs for future work.**

Exhibit A to Master Time Charter Contract

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written in multiple counterparts, which may be original or an electronic reproduction but which will both constitute an original and one and the same document.

**OWNER:**

**Kilgore Marine Services, Inc.**

By: _Charles A. Kilgore_

Printed Name: _Charles A. Kilgore_

Title: _President / CEO_

**CHARTERER:**

**Fieldwood Energy LLC**

By: _John H. Smith_

Printed Name: John H. Smith
                VP - Land & Business Development

Title: _____

Signature Page to Master Time Charter Agreement