UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | CIVIL ACTION NO. 2:17-CV-5394 |
| COMPLAINT OF RODI MARINE, LLC, | § | |
| AS OWNER AND OPERATOR OF THE | § | JUDGE MORGAN |
| M/V WILDCAT, PETITIONING FOR | § | |
| EXONERATION FROM OR | § | MAGISTRATE JUDGE NORTH |
| LIMITATION OF LIABILITY | § | |

STATEMENT OF CONTESTED AND ADDITIONAL MATERIAL
FACTS PERTAINING TO MOTION FOR PARTIAL
SUMMARY JUDGMENT FILED BY RODI MARINE, LLC

NOW COMES, claimant / third party defendant, Fieldwood Energy LLC ("Fieldwood"), and pursuant to Local Rule 56.2 files its Statement of Contested and Additional Material Facts as concerns the Motion for Partial Summary Judgment (Doc. 50) filed by Rodi Marine, LLC ("Rodi"). In Section I, Fieldwood responds to Rodi's proffered Statement of Uncontested Facts (Doc. 50-3). In Section II, Fieldwood identifies the additional facts that are material to resolving Rodi's motion for partial summary judgment. The evidentiary support for each individual statement is attached as exhibits to this pleading.

**I.     Fieldwood's Response to Rodi's Purported Uncontested Material Facts**

1. THE M/V WILDCAT WAS WORKING FOR FIELDWOOD PURSUANT TO THE FIELDWOOD/KILGORE MASTER TIME CHARTER AGREEMENT, EXHIBIT "A".

Admitted in part, denied in part as incomplete. See § II(A)(1-4, 15), *infra*.

2. THE MTCA DEFINES "CHARTERER" AS FIELDWOOD ENERGY LLC".

Admitted.

3. THE MTCA DEFINES "OWNER" AS KILGORE MARINE SERVICES LLC".

Admitted.

4. THE MTCA DEFINES "CHARTERER GROUP" AS

>Charterer (Fieldwood) and its parent, affiliates and subsidiary companies, co-lessees, co-owners, partners, joint venturers, together with its and all of their respective officers, directors, employees, in-house legal counsel and agents, representatives, insurers and invitees of all of the foregoing and the respective successors, spouses, relatives, dependents, heirs, and estates of any of the foregoing.

>Admitted.

5. THE MTCA DEFINES "OWNER GROUP" AS

>Owner (Kilgore) and its parent, affiliates and subsidiary companies, <u>the vessel, and its owners and operators, and</u> its and <u>their respective subcontractors</u> of any tier, together with its and all of their respective officers, directors, <u>employees, masters, operators, crew members</u>, in-house legal counsel, agents, representatives, insurers and invitees and the respective successors, spouses, relatives, dependents, heirs, and estates of any of the foregoing.

>Admitted (emphasis added).

6. THE MTCA DEFINES FIELDWOOD'S INDEMNITY OBLIGATIONS AS FOLLOWS:

>Charterer (Fieldwood) hereby agrees to release, indemnify, protect, defend and hold harmless Owner Group from and against any and all claims arising out of or related to (1) the injury, illness or death of any member of Charterer Group and/or (2) the loss, damage, or destruction and/or wreck and debris removal of any property belonging to any member of Charterer Group, <u>without regard to whether any such injury</u>, illness, death, loss, damage, destruction, wreck and/or debris removal <u>is caused, in whole or in part, by</u> the negligence (whether sole, joint, or concurrent; active or passive), strict liability, statutory liability, contractual liability, breach of warranty or other fault (excluding only <u>the gross negligence and intentional misconduct) of any member of the Owner Group</u> or by any defect or pre-existing condition (whether known or unknown; patent or latent, or otherwise) or unseaworthiness of the vessel.

>Admitted (emphasis added).

7. AT THE TIME OF THE ACCIDENT, SHAWN PHILBECK, LIONEL EVERY, AND ANTONIO SMITH WERE EMPLOYEES OF FIELDWOOD.

>Admitted.

8. RODI TENDERED ITS DEFENSE AND INDEMNITY TO FIELDWOOD.

Objection as irrelevant.  Subject to, and without waiving, the foregoing objection, Fieldwood admits Rodi Fact No. 8.

9. FIELDWOOD DENIED THE TENDER.

Admitted.

10. RODI SEPARATELY TENDERED ITS SETTLEMENT WITH SHAWN PHILBECK TO FIELDWOOD AS FAIR AND REASONABLE.

Objection as irrelevant.  Subject to, and without waiving, the foregoing objection, Fieldwood admits Rodi Fact No. 10.

11. FIELDWOOD DID NOT REPLY.

Objection as irrelevant.  Subject to, and without waiving, the foregoing objection, Fieldwood admits Rodi Fact No. 11.

12. RODI SETTLED WITH SHAWN PHILBECK FOR $150,000.

Objection as irrelevant.  Subject to, and without waiving, the foregoing objection, Fieldwood admits Rodi Fact No. 12.

**II.   Additional Material Facts Necessary to Resolve Rodi's Motion for Partial Summary Judgment**

**A.   Rodi Owes Fieldwood Contractual Defense and Indemnity in Accordance with the Brokerage Agreement.**

1. On May 6, 2014, Rodi, designated as "Operator", and Kilgore Marine Services, L.L.C. (hereafter "Kilgore"), designated as "Broker" executed a Brokerage Agreement, a copy of which is attached as Exhibit 1.

2. Pursuant to the Brokerage Agreement, Rodi appointed Kilgore as Rodi's agent for obtaining charters or similar work contracts for Rodi's vessels. (Exh. 1, Brokerage Agreement, p. 1, art.1.)

3. As set forth in the Brokerage Agreement, Kilgore acted at all times as the broker of the M/V WILDCAT. (Exh. 1, Brokerage Agreement, p. 1, art.1; Doc. 5, Third Party Complaint, p. 5, para. 8.)

4. The Brokerage Agreement further provided as concerns the existence of master time charter parties:

> It is understood that in consideration of procuring work for [Rodi's] vessel, Charterer may require that a Master Time or similar charter be in place between [Kilgore] and Charterer, and that the charter of [Rodi's] vessel will be controlled by the Time Charter. [Rodi] agrees to assume any and all obligations which [Kilgore] has assumed in any such Time Charter including, but not limited to, all defense and indemnity and insurance procurement obligations.

(Exh. 1, Brokerage Agreement, p. 2, art. 2.)

5. Article 5 of the Brokerage Agreement states as follows:

> [Rodi] agrees to protect, defend, and indemnify and safe harmless Broker Group for, from and against [1] <u>any and all claims, demands, causes of action and liabilities of every kind and character, whether to person or property (including, but not limited to personal injury</u>, death, property damage or loss, <u>economic damages</u>, costs of litigation and attorneys' fees), <u>without limit and</u> [2] <u>without regard to the cause or causes thereof or the alleged</u>, actual, passive, primary and/or secondary negligence, <u>breach of</u> warranty or <u>contract</u>, fault or unseaworthiness <u>of Broker Group</u> and/or any other person or entity, and [3] <u>whether brought or presented by [Rodi]</u> or by an employee, servant, and/or agent of [Rodi], and/or any contractor, sub-contractor, invitee, vendor or client of [Rodi] and/or their employees, servants or, agents, arising directly or indirectly out of, incident to, and/or connected with (i) [4] <u>the work and/or services to be performed under this agreement</u>, and/or (ii) [Rodi's] failure to honor any of the obligations set forth in Section 2(B) of this agreement.
>
> * * *
>
> In addition, [Rodi] shall reimburse Broker Group for any court costs, <u>attorney's fees or any other expenses incurred in pursuit</u> or enforcement of these defense, indemnity or insurance obligations.

(*Id.*, p. 3, art. 5) (emphasis and bracketed numbering added).

6. Effective January 1, 2014, Kilgore and Fieldwood executed a Master Time Charter Agreement (hereafter "Time Charter"), a copy of which is attached as Exhibit 2.

{N1519135 -}                                    4

7. Paragraph 2 of the Time Charter envisioned Kilgore acting as a broker for the vessels Fieldwood would decide in the future to charter under the terms and conditions of the Time Charter, as follows:

> This Agreement does not obligate [Kilgore] to charter its vessels to [Fieldwood], nor does it obligate [Fieldwood] to hire <u>any vessel or vessels</u> owned, <u>brokered</u>, or chartered <u>by [Kilgore]</u>, but it, together with any Short Form between [Kilgore] and [Fieldwood] dated subsequent to the Effective Date, shall govern the respective rights and duties of [Kilgore] and [Fieldwood] with respect to the charter of [Kilgore's] vessels by [Fieldwood].

(Exh. 2, Time Charter, pp. 1 – 2, para. 2.)

8. The Brokerage Agreement granted Kilgore authority, as broker, to provide the WILDCAT to Fieldwood for its use as time charterer of the WILDCAT pursuant to the Time Charter. (Exh. 1, Brokerage Agreement, p. 1, para. 1.)

9. The Brokerage Agreement defined the term "Charterer" as "any customer for whom the vessel will be working". (*Id.*, p. 1, para. 1.)

10. Additionally, the Brokerage Agreement defined the term "Broker Group" as including Kilgore, and "any Charterer or customer for whom work is to be performed." (*Id.*)

11. The M/V WILDCAT was working for Fieldwood on or about April 18, 2017, when the M/V WILDCAT allided with a platform in the Gulf of Mexico. (Doc. 5, Third Party Complaint, p. 5, para. 8; Doc. 19, Answer and Affirmative Defenses to Third Party Complaint, p. 3, para. 8.)

12. Accordingly, Fieldwood was a member of the Broker Group. (Exh. 1, Brokerage Agreement, p. 1, para. 1.)

13. Personal injury claims were filed in Rodi's limitation proceeding by the following individuals: Antonio Smith (Doc. 4, para. I(1) – "Claimant suffered severe bodily injuries"), Shawn Philbeck (Doc. 8, para. I – "Shawn Philbeck . . . sustained injuries"), and Lionel Every Jr.

(Doc. 12, para. III(3.1) – "Claimant sustained severe and disabling injuries").

14. Rodi has settled the personal injury claims of the other passengers.

15. On April 17 and 18, 2017, the M/V WILDCAT was working and performing services by virtue of both the Brokerage Agreement and the Time Charter. (Doc. 5, Third Party Complaint, p. 5, para. 8; Doc. 19, Answer and Affirmative Defenses to Third Party Complaint, p. 5, para. 8.)

      **B.    Alternatively, Rodi is not a Member of the Owner Group of the Time Charter.**

16. Rodi Marine, LLC ("Rodi") is a Louisiana limited liability company with its registered address at 128 Tonbridge Drive, Lafayette, Louisiana. (Articles of Organization, Initial Report and Affidavit of Acceptance of Rodi Marine, LLC, copies of which are attached *in globo* as Exhibit 3.)

17. GJR Marine LLC was the owner of the M/V WILDCAT at the times of the April 18, 2017, allision (hereafter "Allision") of the vessel with Platform S, located in Block 23, South Timbalier Area (hereafter "ST 23-S"). (Certificate of Documentation for the M/V WILDCAT, dated June 16, 2016, see entries for Owners and Managing Owner, copy attached as Exhibit 4.)

18. The Federal Communications Commission issued the Radio Station license for the M/V WILDCAT to GJR Marine, LLC. (Radio Station Authorization, copy attached as Exhibit 5.)

19. At the time of the Allision, Rodi was not the owner of the M/V WILDCAT.

20. GJR Marine, LLC is a Louisiana limited liability company, with its registered office at 2544 SW Evangeline Thruway, Lafayette, Louisiana. (Articles of Organization, Acknowledgement, and Initial Report of GJR Marine, LLC, dated July 13, 2012, copies of which are attached *in globo* as Exhibit 6.)

21. RODI Marine Management, LLC employed the crew of the M/V WILDCAT on duty at the time of the Allision, deckhand / operator, James Hammond, and Captain Randy Louviere. (Deposition of James Hammond, hereafter "Hammond depo.", pp. 12 – 13, excerpts of which are attached as Exhibit 7; Application for Employment by James Hammond, attached as Exhibit 8; Deposition of Capt. Randy Louviere, hereafter "Louviere depo.", pp. 11 – 12, excerpts of which are attached as Exhibit 9; Application for Employment by Randy Louviere, attached as Exhibit 10.)

22. RODI Marine Management, LLC issued the paychecks to Mr. Hammond and Capt. Louviere. (Hammond depo., p. 12.)

23. RODI Marine Management, LLC is a Louisiana limited liability company, with its registered office at 2544 SW Evangeline Thruway, Lafayette, Louisiana. (Articles of Organization, Acknowledgment, and Initial Report of Rodi Marine Management, LLC, dated November 23, 2010, copies of which are attached *in globo* as Exhibit 11.)

24. Rodi did not employ the masters or crew members of the M/V WILDCAT at the time of the Allision.

25. The Report of Marine Casualty for the Allision completed by Capt. Louviere identified "Rodi Marine Fast Supply Vessels" is the operating company of the M/V WILDCAT. (Louviere depo., p. 13; Report of Marine Casualty, dated April 19, 2017, copy attached is Exhibit 12.)

26. RODI Marine Management, LLC issued correspondence to Fieldwood concerning some root causes of the Allision. (May 10, 2017, correspondence from RODI Marine Management, LLC to Fieldwood, a copy of which is attached as Exhibit 13.)

27. Besides the Brokerage Agreement, there is no document that identifies Rodi as

the actual operator of the M/V WILDCAT.

28. In accordance with the Brokerage Agreement, Rodi was the principal and Kilgore was Rodi's agent. (Exh. 1, Brokerage Agreement, p. 1, art.1.)

29. As concerns the M/V WILDCAT, Rodi was not a subcontractor of the M/V WILDCAT, GJR Marine, LLC or RODI Marine Management, LLC.

30. Rodi is not a member of "Owner Group" as defined by Paragraph 12(a)(iii) of the Time Charter.

    **C.    Alternatively, the Allision was Caused in Part by the Gross Negligence of the Owner Group, Voiding Fieldwood's Indemnity Obligations to Rodi in Paragraph 12(b)(ii) of the Time Charter**

1. If the Owner Group, as defined in Paragraph 12(a)(iii) of the Time Charter, were grossly negligent in part in causing the Allision, then Fieldwood has no obligation to defend or indemnify Owner Group for the personal injury claims of Fieldwood employees. (Exh. 2, Time Charter, para. 12(b)(ii).)

2. The Owner Group is defined by Paragraph 12(a)(iii) to include the vessel's owner, operator, and their employees, masters, operators and crew members. (Exh. 2, Time Charter, para. 12(a)(iii).)

3. For purposes of Time Charter Paragraph 12(a)(iii), the vessel was the M/V WILDCAT. (*Id.*)

4. For purposes of Time Charter Paragraph 12(a)(iii), the vessel's owner was GJR Marine, LLC. (*Id.*; Exh. 4, Certificate of Documentation; Exh. 5, Radio Station Authorization.)

5. For purposes of Time Charter Paragraph 12(a)(iii), the vessel's operator was RODI Marine Management, LLC, the employer of the vessel crew, and Mr. Hammond and Capt. Louviere were the employees of the operator. (Exh. 2, Time Charter, para. 12(a)(iii); Exh. 7,

Hammond depo., pp. 12 – 13; Exh. 8, Application for Employment by James Hammond 8; Exh. 9, Louviere depo., pp. 11 – 12; Exh. 10, Application for Employment by Randy Louviere.)

6. At all times relevant herein, Mr. Hammond was a deckhand of the M/V WILDCAT thus a crewmember of the vessel, and a member of the Owner Group for purposes of Time Charter Paragraph 12(a)(iii). (Hammond depo., p. 14.)

7. At all times relevant herein, Mr. Hammond was also driving or operating the M/V WILDCAT for several minutes prior to and including the time of the Allision, and thus a member of the Owner Group for purposes of Time Charter Paragraph 12(a)(iii). (Hammond depo., p. 87.)

8. For purposes of Time Charter Paragraph 12(a)(iii), at all relevant times, Capt. Louviere served as the master of the M/V WILDCAT, and thus a member of the Owner Group. (Louviere depo., p. 38.)

9. Prior to the time of the Allision, Mr. Hammond did not hold any merchant mariner's licenses. (Hammond depo., p. 17.)

10. He had not received any training or instruction to obtain a license as a mate or a master. (Hammond depo., pp. 19 – 20.)

11. Under no circumstances did James Hammond hold the proper license to operate the M/V WILDCAT. (Louviere depo., p. 120.)

12. Prior to the accident, Capt. Louviere and Mr. Hammond were on watch in the wheelhouse of the M/V WILDCAT, as the vessel was leaving Fieldwood's Grand Isle 90 – A platform bound for the Fieldwood dock on Grand Isle. (Hammond depo., p. 87.)

13. It was daylight during that trip. (Hammond depo., pp. 152- 53.)

14. In order to get to and from Fieldwood's Grand Isle 90 – A platform from

Fieldwood's Grand Isle shore base, the M/V WILDCAT had to navigate to the west and around the Louisiana Offshore Oil Port, or LOOP.  (Hammond depo., p. 78.)

15. On the return trip, from the Grand Isle 90-A platform back to the Grand Isle shore base, Capt. Louviere was navigating to the west to avoid the LOOP.  (Hammond depo., p. 78.)

16. Both Mr. Hammond and Capt. Louviere were aware that as the M/V WILDCAT got closer to shore the number and density of offshore platforms and other structures increased.  (Hammond depo., p. 90; Louviere depo., p. 106.)

17. Capt. Louviere left the unlicensed Mr. Hammond behind the wheel of the M/V WILDCAT to go to the bathroom.  (Hammond depo., p. 107; Louviere depo., p. 92.)

18. The vessel's speed at that time was between 20 to 21 and ½ knots, cruising speed.  (Hammond depo., p. 100; Louviere depo., pp. 111 – 12.)

19. Mr. Hammond did not adjust the course of the vessel, but left it on auto-pilot in the direction that Capt. Louviere had it when he left the wheelhouse.  (Hammond depo., pp. 110.)

20. Unless the knob of the auto-pilot is turned, the vessel will maintain its current heading or direction.  (Louviere depo., p. 29.)

21. It was daylight when Capt. Louviere left the wheelhouse.  (Hammond depo., pp. 89, 155.)

22. According to Mr. Hammond, visibility was clear, with one to two foot seas.  (Hammond depo., p. 107.)

23. Capt. Louviere testified similarly; there was six plus miles of visibility, clear skies, eight knot winds from the east, and two to three foot seas. (Louviere depo., p. 176.)

24. After Capt. Louviere left the wheelhouse, Mr. Hammond fell asleep behind the wheel of the M/V WILDCAT.  (Hammond depo., pp. 149, 191 & 209.)

25. The next thing Mr. Hammond recalled was the vessel striking a platform, which is what woke him up.  (Hammond depo., pp. 99 – 100.)

26. Capt. Louviere was not in the wheelhouse before the WILDCAT struck the platform.  (Hammond depo., p. 99.)

27. Capt. Louviere testified that after he finished in the bathroom, he went into the galley to get a banana to eat.  (Louviere depo., pp. 92 - 93.)

28. Thereafter, Capt. Louviere conducted a check of the engine room, propeller shafts, and generators.  (Louviere depo., pp. 95 - 99.)

29. Before heading back to the wheelhouse, Capt. Louviere sat down in the doorway between the rudder room and the generator room to tie his shoe, when he fell forward.  (Louviere depo., pp. 99 – 100.)

30. Checking the engine room, the rudders and the generators are ordinarily performed by the deckhand or engineer, not the captain or master on duty.  (Hammond depo., p. 179.)

31. Previously, no captain that had worked with Mr. Hammond checked the engine room or the generators without there first being a problem.  (Hammond depo., pp. 178 – 79.)

32. The Rodi Marine Services Safety Management System (hereafter "Safety Management System") was designed to provide recognized international standards for the safe management of vessels.  (Rodi Marine Services Safety Management System, excerpts of which are attached as Exhibit 14, p. 1 of 5, § 1.1.)

33. The Safety Management System was to be "used by Rodi Marine Services and its subsidiary companies, herein referred to as the Company".  (*Id.*)

34. The Safety Management System later defined the term "Company" as Rodi

Marine Operators and its subsidiary companies. Owner of vessel(s) who has the responsibility for the operation of the vessel(s) and duty to comply with the ISM Code." (*Id.*, p. 2 of 5, § 1.1(D).)

35. Rodi Marine, LLC, GJR Marine, LLC and RODI Marine Management, LLC are separately owned limited liability companies, not subsidiaries of either Rodi Marine Services or Rodi Marine Operators. (Exh. 3, Rodi Marine, LLC, Articles of Organization; Exh. 6, GJR Marine, LLC, Articles of Organization; Exh. 11, RODI Marine Management, LLC, Articles of Organization.)

36. There is no Safety Management System applicable to Rodi Marine, GJR Marine or RODI Marine Management.

37. The Watch Standing provisions of the Safe Operations Manual provide, "**NOTE: Except in an emergency, there must be a minimum of (2) crewmembers awake and on navigation watch, (fulfilling the procedures outlined in this section) while underway on Company vessels.**" (Safe Operations Manual, § 3.010, p. 1 of 14 (underlining and bold-face in the original attached as Exhibit 15).

38. The Work Hours and Rest Periods section of the Watch Standing provisions states, as follows:

> Every person assigned duty as Officer in Charge of a Navigational or Engineering Watch, or duty as ratings forming part of a navigational of (sic) engineering watch, or designated safety, prevention of pollution, and security duties onboard any Company vessel must receive:
>
> a. A minimum of 10 hours of rest in any 24-hour period.

(Safe Operations Manual, § 3.010(A)(2), p. 1 of 14.)

39. The captains and crew of the M/V WILDCAT each work a 12 – hour shift per day. (Hammond depo., pp. 49 – 50; Louviere depo., pp. 82 – 83.)

40. The first shift starts at midnight and ends at noon, which the WILDCAT crew referred to as the "a.m.'s". (Hammond depo., p. 70; Louviere depo., pp. 82 – 83.)

41. The second shift starts at noon and ends at midnight, which the WILDCAT crew referred to as the "p.m.'s". (Hammond depo., p. 70.)

42. The M/V WILDCAT had a permanent crew of four captains and three deckhands. (Hammond depo., p. 53.)

43. The work hitch of the deckhands was fourteen days on the vessel, and seven days on shore. (Hammond depo., p. 44.)

44. The work hitch of the captains was seven days on the vessel, and seven days on shore. (Hammond depo., p. 53.)

45. The captains and deckhand that were going to board the vessel and begin their hitch met at the Lafayette office of Rodi Marine Management. (Hammond depo., p. 45.)

46. Once everyone was there, they would board a company truck and drive to the location where the vessel would be. (Hammond depo., pp. 45 – 46.)

47. En route, the truck would stop and the crew would purchase groceries for the coming week. (Hammond depo., p. 48.)

48. At or near midnight of the day for crew changes for the M/V WILDCAT, two captains and one deckhand would leave the vessel, and two captains and one deckhand would board the vessel.

49. RODI Marine Management, LLC paid the crew beginning their shift on the day of the crew changes. (Louviere depo., p. 167.)

50. On midnight April 18, Capt. Louviere, Capt. Lynn Dugas and Mr. Hammond began the first day of their hitch on the M/V WILDCAT. (Louviere depo., pp. 63 – 64.)

51.     The first a.m. shift of the M/V WILDCAT would be manned by one of the captains and the deckhand boarding the vessel to begin their shift at midnight. (Hammond depo., p. 69; Louviere depo., p. 82 - 83.)

52.     Mr. Hammond received a maximum of two hours of sleep between the time he woke up on April 17 at 6:30 a.m. until the Allision of the M/V WILDCAT, which occurred on April 18 at approximately 9:00 a.m. (Hammond depo., p. 150.)

53.     It did not surprise Capt. Louviere that Mr. Hammond only had two hours of sleep in the twenty-eight hours preceding the Allision. "That was typical." (Louviere depo., pp. 101 – 02.)

54.     Between 5:00 a.m. on April 17, until 3:00 a.m. on April 18, Capt. Louviere had one hour of sleep. (Louviere depo., pp. 157 – 58.)

55.     If Capt. Louviere is going to work the a.m.'s, it is normal for Capt. Louviere to only have two to three hours of sleep for the preceding 24-hour period before he is relieved by Capt. Dugas. (Louviere depo., pp. 84 – 85.)

56.     This pattern of short rest for the a.m. shift after crew changes had been going on for five and one-half years before the Allision. (Louviere depo., p. 104).

57.     Mr. Hammond testified as follows concerning his awareness of the risks of falling asleep behind the wheel of the M/V WILDCAT:

> Q.     And you want to make sure that you have a clear and competent and non-fatigued operator of the vessel specifically to avoid a collision and the resulting problems that could result if the person behind the wheel falls asleep, right?
>
> A.     Yes.
>
> Q.     I mean, you knew that was a specific risk that could happen when Captain Louviere left you alone in the wheelhouse, right?

> A. Correct.
>
> Q. Okay. You did nothing to tell him, "Cap, this is a bad idea. I've only had two hours of sleep in the past 24 hours. Can you just wait." Right?
>
> A. Correct.
>
> Q. Okay. You knew that if you fell asleep that you were placing not only the vessel at risk, but your life, the life of the captain and the passengers riding below deck at significant risk of harm, right?
>
> A. Correct.
>
> Q. Yet you did nothing to stop it, right?
>
> A. Correct.
>
> Q. And you knew that you could stop it and not face any problems or discipline from the company for exercising your stop work authority, right?
>
> A. Right.
>
> Q. But you did it anyway?
>
> MR. MORSE:
> Object to the form. …
>
> THE WITNESS:
> That's correct.

(Hammond depo., p. 200 – 01.)

    58. Capt. Louviere was also aware of the risks of collision should Mr. Hammond fall asleep behind the wheel while Capt. Louviere was not in the wheelhouse.

> Q. All right. Before you went down out of the wheelhouse, did you tell Mr. Hammond that you – what did you tell him that you would be going for?
>
> A. I said, "James, I have to make a bathroom run." I said, "Are you all right? You feel okay?"
>
> His response was, "Yes."

I said, "I'm going to the bathroom, and I'll be right back."

Q. Okay. Did – and then you added other tasks on to that?

A. Yeah, which was bad on my part.

Q. Right, I mean, getting a banana on the way back up, that's not a problem, but extending the time away from the wheel, you realize now, that was a serious mistake?

A. Yeah, mistake on my part.

Q. Okay. Especially given the propensity that he had only two to three hours of sleep maximum for the 24 hours before?

A. Correct.

Q. Okay. And you knew one of the risks that could happen in this particular area that you're navigating is that if he falls asleep, you've got a risk of either hitting another vessel or at least another – or at least a platform?

A. Yes.

Q. Right. Because the further you go in shore in this area of the Gulf of Mexico, the more platforms and caissons there are, correct?

A. Correct.

(Louviere depo., pp. 105 – 06.)

Q. And you knew that was one of the risks that could happen when you left the wheelhouse with James at the wheel?

A. Yeah, I was aware of it.

Q. Okay. And despite that risk, you disregarded it and went to the bathroom anyway leaving him at the wheel?

A. I guess in a sense, I did.

(Louviere depo., p. 107.)

59. The officers and directors of Rodi Marine asked Capt. Louviere questions regarding operations and safety issues of the WILDCAT. (Louviere depo., pp. 156 – 57.)

60. As concerns the short – rest issues concerning the oncoming captains and deckhand on crew change day, Capt. Louviere testified as follows:

> Q. Did this issue ever come up on the crew schedule and the amount of hours that people were required to be up particularly on that first day of your hitch?
>
> A. After the accident, we talked about it.
>
> Q. Did you ever mention it before?
>
> A. We did mention it a couple of times.
>
> Q. But nothing was ever done before the accident?
>
> A. Nothing was ever done.

(Louviere depo., p. 157.)

61. Mr. Hammond testified that the company was aware of the situation where the oncoming Captain and deckhand would be working on short rest and the potential dangers associated with it. (Hammond depo., p. 148.)

> Q. Right. And then that information would be relayed back to the company, correct? Or it should have been?
>
> A. The company is aware of the situation.
>
> Q. Right. Rodi Marine knew about that, right?
>
> A. That's correct.
>
> Q. The management knew about it? How did the management know about it?
>
> A. Because either way you do it, somebody's going to be up, either it's the guy that's on the boat or just getting there. There's no way around it.
>
> Q. So again, the port captain and the management of Rodi Marine had to be aware of that? Do you agree with me?
>
> A. I agree.

(Hammond depo., pp. 148 – 49.)

Respectfully submitted:

   /s/ James D. Bercaw
James D. Bercaw, T.A. (20492)
**KING & JURGENS, L.L.C.**
201 St. Charles Avenue, 45th Floor
New Orleans, Louisiana 70170
Telephone: (504) 582-3800
Facsimile: (504) 582-1233
Email:    jbercaw@kingkrebs.com

*Counsel for Claimant / Third Party Defendant, Fieldwood Energy LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

   /s/ James D. Bercaw