UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE            C.A. NO. 2:17-CV-5394-GGG-MBN
COMPLAINT OF RODI MARINE,
LLC, AS OWNER AND OPERATOR
OF THE M/V WILDCAT,
PETITIONING FOR EXONERATION            JUDGE GUIDRY
FROM OR LIMITATION OF
LIABILTIY

           MAGISTRATE JUDGE NORTH

### EXCESS UNDERWRITERS' RESPONSE TO FIELDWOOD'S STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF ITS MOTIONS FOR PARTIAL SUMMARY JUDGMENT TO DISMISS INDEMNITY INSURANCE CLAIMS OF THE RODI ENTITIES

Certain Underwriters at Lloyd's, London and Navigators Insurance Company subscribing to Policy Number TMU-407507 (collectively "Excess Underwriters") respond as follows to Fieldwood Energy, LLC's Statement of Uncontested Facts in support of its Motion for Partial Summary Judgment to Dismiss Indemnity and Insurance Claims of the Rodi Entities.

**A.**     **The GJR Brokerage Agreement and its Insurance Provisions**

1.    On May 10, 2015, GJR, identified as "Operator", and Kilgore, identified as "Broker" executed the GJR Brokerage Agreement, a true and correct copy of which is attached as Exhibit 1.

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

2.    Pursuant to the GJR Brokerage Agreement, GJR appointed Kilgore as GJR's agent for obtaining charters or similar work contracts for GJR's vessel, the M/V WILDCAT. (Exh. 1, Brokerage Agreement, p. 1, art.1.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

3.     As set forth in the GJR Brokerage Agreement, Kilgore acted at all times as the broker of the M/V WILDCAT. (Exh. 1, Brokerage Agreement, p. 1 art. 1.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

4.     The purpose of the GJR Brokerage Agreement was to use the WILDCAT, a vessel, as a crew vessel especially for Fieldwood. (Deposition of Kilgore Vice President, Andrew Louis Naquin, hereafter "Naquin depo.", p. _____, excerpts of which will be filed as Exhibit 2, and attached to an identical Supplemental Statement of Uncontested Facts with the appropriate page numbers when the certified copy of the deposition is received by Fieldwood.)

**RESPONSE:**  Admitted.

5.     The WILDCAT played a substantial role in the completion of the GJR Brokerage Agreement. (Id., p. _____.)

**RESPONSE:** Admitted, upon information and belief.

6.      All of Kilgore's brokerage agreements were contracts relating to the vessels to be used as a vessel for purposes of Kilgore's customers (*Id*., p. _____.)

**RESPONSE:**  Admitted, upon information and belief.

7.     Kilgore brokers three types of vessels to its customers: (1) utility boats, (2) crew boats and (3) offshore supply boats. (Id., p.____.)

**RESPONSE:**  Admitted, upon information and belief.

8.     The utility vessels that Kilgore brokered would move cargo and personnel from shore to offshore structures, and among offshore structures. (*Id*., p._____ .)

**RESPONSE:** Admitted, upon information and belief.

9.     The purpose of the crew boats that Kilgore brokers to its customers are to move mostly personnel, but also fuel and water to and from offshore structure and shore bases, as well as among various platforms. (*Id*., p. _____ .)

**RESPONSE:** Admitted, upon information and belief.

10.    The offshore supply vessels that Kilgore brokers to its customers are used to carry supplies and underdeck cargo, liquid mud and drilling fluid from shore to offshore, or among various platforms offshore. (*Id*., p.     .)

**RESPONSE:** Admitted, upon information and belief.

11.    The term "Broker Group" was defined to include Kilgore "and any Charterer or customer for whom work was to be performed." (*Id*., p. 1.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

12.    The term "Charterer" was defined to "include any customer for whom the vessel will be working." (*Id*.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

13.    The W/V WILDCAT was working for Fieldwood on or about April 18, 2017, when the M/V WILDCAT allided with a platform in the Gulf of Mexico. (Doc. 83, Second Verified Claim of Fieldwood Energy LLC, hereafter "Fieldwood's Second Claim", p. 9, para. XXVI; Doc. 114, Answer to Fieldwood's Second Verified Claim, p. 5, para. XXVI.)

**RESPONSE:** Admitted.

14.     On April 17 and 18, 2017, the M/V WILDCAT was working and performing services pursuant to both the GJR Brokerage Agreement and the Time Charter. (*Ibid.*)

   **RESPONSE:**  Admitted.

15.     Fieldwood is a member of the Broker Group.

   **RESPONSE:**  Admitted.

16.     The second unnumbered paragraph of Paragraph 5 of the Brokerage Agreement contained the following unlimited and unrestricted insurance provision in favor of "Broker Group": "[GJR] further ... agrees that all members of Broker Group will be named as an additional assured(s) with waiver of subrogation on all [GJR] insurance policies." (Exh 1, GJR Brokerage Agreement, p. 3, para. 5, 2d unnum. para.)

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

17.     The GJR Brokerage Agreement required GJR to name Fieldwood as an additional insured with waiver of subrogation on GJR's insurance policies.

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.  Fieldwood's statement offers an improper legal conclusion that is properly within the purview of the Court.

18.     The second unnumbered paragraph of Article 2 of the GJR Brokerage Agreement passed through to GJR, any insurance obligations that Kilgore may owe to Fieldwood under the Time Charter, as follows:

> It is understood that in consideration for procuring work of [GJR's] vessel, [Fieldwood] may require that a Master Time Charter or similar charter be in place between [Kilgore] and [Fieldwood], and that the charter of [GJR's] vessel will be controlled by the Time Charter. [GJR] agrees to assume any and all obligations which [Kilgore] has assumed in any such Time Charter, including, but not limited to, all defense and indemnity and insurance procurement obligations.

- 4 -

(Id., p. 2, para. 2, 2d unnum. para.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

### B. The "Naming" and "Waiving" Provisions of the Navigators Policy

19.     Policy No. HO16LIA00252402 (hereafter "the MGL Policy") was issued on January 30, 2017 by Navigators Insurance Company ("Navigators") to Rodi Marine, L.L.C. in Lafayette, Louisiana, through Rodi's brokers also located in Lafayette, with a policy period starting on January 1, 2017. (MGL Policy, Declarations, p. 1 of 65, a true and correct copy of which is attached as Exhibit 3.)

**RESPONSE:**  Admitted, upon information and belief.

20.     The MGL Policy was delivered in Louisiana.

**RESPONSE:**  Admitted, upon information and belief.

21.     The WILDCAT was listed on the Schedule of Vessels. (MGL Policy, Schedule of Vessels, p. 35 of 65.)

**RESPONSE:**  Admitted, upon information and belief.

22.     GJR and Management are listed as an Additional Named Assured. (MGL Policy, Additional Named Assured Endorsement, p. 60 of 65.)

**RESPONSE:**  Admitted, upon information and belief.

23.     The MGL Policy contained the following Blanket Additional Assured and Blanket Waiver of Subrogation Endorsement:

I.      Section II -- Who is An Assured is amended to include as an additional assured any person or organization to whom the Named Assured is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this policy or who is added by endorsement, but only with respect to liability arising out of your work.

- 5 -

II.      The following is added to Paragraph 9. Transfer of Rights Of Recovery Against Others to Us of Section IV — Conditions:

> We waive any right of recovery we may have against the person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization for whom the Named Assured is required to waive subrogation.

> This waiver of subrogation will apply only when the waiver is issued prior to an "occurrence."

(MGL Policy, p. 64 of 65, Blanket Additional Assured and Blanket Waiver of Subrogation Endorsement.)

**RESPONSE:** Admitted.

24.    The Allision occurred on April 18, 2017, after the May 10, 2015, date of the GJR Brokerage Agreement and after the January 1, 2017, inception date of the MGL Policy.

**RESPONSE:** Admitted.

25.    By operation of the GJR Brokerage Agreement and the Blanket Additional Assured and Blanket Waiver of Subrogation Endorsement of the MGL Policy, Fieldwood qualifies as an additional assured on the MGL Policy.

**RESPONSE:** Denied. The GJR Brokerage Agreement and the MGL Policy speak for themselves, and, as written documents, are the best evidence of their contents. Fieldwood's statement offers improper legal conclusions that are properly within the purview of the Court.

26.    Furthermore, the GJR Brokerage Agreement and the foregoing endorsement required Navigators to waive its rights of subrogation against Fieldwood.

**RESPONSE:** Denied. The GJR Brokerage Agreement and the MGL Policy speak for themselves, and, as written documents, are the best evidence of their contents. Fieldwood's statement offers improper legal conclusions that are properly within the purview of the Court.

### C. The "Naming" and "Waiving" Provisions of Excess Underwriters' Policy

27.     Cover Note TRM-407507, through which third party defendant, Certain Underwriters at Lloyd's, London and Navigators Insurance Company (hereafter collectively "Excess Underwriters") was issued on January 9, 2017 by Excess Underwriters to Rodi Marine, L.L.C. in Lafayette, Louisiana, through Rodi's brokers also located in Lafayette, with a policy period starting on January 1, 2017. (Cover Note TRM-407507, hereafter "Excess Policy", Cover Sheet, p. 1 of 40, a true and correct copy of which is attached as Exhibit 4.)

**RESPONSE:** Denied as stated. Excess Underwriters subscribed to the Excess Policy, but it was issued through Rodi's brokers.

28.     The Excess Policy was delivered in Louisiana.

**RESPONSE:** Admitted.

29.     The Excess Policy contained the following Choice of Law & Jurisdiction provision: "In case of any dispute arising out of this insurance, the same shall be governed by and construed in accordance with Louisiana law and practice, jurisdiction subject to Institute Service of Suit Clause." (*Id*., Choice of Law & Jurisdiction, p. 6 of 40.)

**RESPONSE:** Admitted.

30.     The WILDCAT was listed on the Schedule of Vessels. (*Id*., Schedule of Vessels, p. 40 of 40.)

**RESPONSE**: Admitted.

31.     GJR is named as an Assured on the Risk Details. (*Id*., Risk Details, p. 5 of 40.)

**RESPONSE:** Admitted.

32.     According to the definition of "Insured" discussed further below, Item 1 of the Declarations lists the Name and Address of the Named Insured "As per Risk Details". (*Id*., Declarations, p. 8 of 40.)

PD.28756201

**RESPONSE:** The Excess Policy speaks for itself and, as a written document, is the best evidence of its contents.

33.     GJR is a Named Insured and thus an "Insured" under the Excess Policy.

**RESPONSE:** The Excess Policy speaks for itself and, as a written document, is the best evidence of its contents.

34.     The Excess Policy's definition of "Insured" includes additional insureds where required by written contract, as follows:

> 13. INSURED
>
> > The word "Insured", wherever used in this Policy, shall mean only the following:
>
> (a)   the named "Insured" set out in Item 1 of the Declarations
>
> > > \* \* \*
>
> (d)   any person or organization, other than the named "Insured", included as an additional insured in the policies listed in Item 2 of the Declarations but not for broader coverage than is available to such person or organization under such underlying policies;

(Id., § IV (13), p. 25 of 40.)

**RESPONSE:**   Denied as stated.   The definition of "Insured" cited by Fieldwood is incomplete.   As discussed more thoroughly in Excess Underwriters' Motion for Summary Judgment, the Excess Policy also defines an "Insured," in part as, "any person or entity to whom the "Insured" is obliged by a written "Insured Contract" entered into before any relevant "Occurrence", to provide insurance such as is afforded by this Policy but only with respect to: (i) liability arising out of operations conducted by the named "Insured" or on its behalf; or (ii) facilities owned or used by the named "Insured" … (See the Excess Policy, ECF 187-3, at p. UW11.)  As discussed more fully in Excess Underwriters' Motion for Summary Judgment, Excess

- 8 -

Underwriters dispute that the Brokerage Agreement is an "Insured Contract," and that Fieldwood is an additional insured under the Excess Policy. (ECF 187-3, at US 25-26).

35.    Item 2 of the Declarations identifies the Underlying Insurance(s) "AS PER SCHEDULE ATTACHED". (*Id*., Declarations, p. 8 of 40.)

      **RESPONSE:** Admitted.

36.    The Schedule of Underlying Insurances includes Navigators' Marine General Liability Policy No. HO17LIA00252401, in other words, the MGL Policy discussed in § II(B), supra. (*Id*., Declarations, p. 39 of 40.)

      **RESPONSE:** Admitted.

37.    Accordingly, because Fieldwood is identified as an additional assured on the MGL Policy, Fieldwood also is included as an "Insured" on the Excess Policy.

      **RESPONSE:** Denied. Item 37 is a proposed legal conclusion, not a statement of fact. Excess Underwriters deny that Fieldwood is an additional assured under the MGL Policy or the Excess Policy for the reasons stated in the Rodi's Response to Fieldwood's Motion for Summary Judgment (ECF 193), and all other terms, conditions, limitations, and exclusions relevant to Fieldwood's claim. Additionally, for the reason discussed more thoroughly in Excess Underwriters' Motion for Summary Judgment (ECF 187), Fieldwood also is not an additional insured under the Excess Policy *via* the underlying agreements, including the Brokerage Agreements, because they are not "Insured Contracts" as defined by the Excess Policy.

38.    The Excess Policy also contains the following waiver of subrogation endorsement:

              Insurers agree to waive their rights of subrogation against any principal where waiver is required by written contract but only in respect of liability for Bodily Injury and/or Property Damage arising out of operations

- 9 -

> > performed by the Named Assured and only to the extent required under said
> > written contract.

(*Id*., Waiver of Subrogation Endorsement, p. 34 of 40.)

> **RESPONSE:** Admitted.

39.     On April 17 and 18, 2017, the M/V WILDCAT was working and performing services pursuant to both the GJR Brokerage Agreement and the Time Charter. (Doc. 83, Second Verified Claim of Fieldwood Energy LLC, hereafter "Fieldwood's Second Claim", p. 9, para. XXVI; Doc. 114, Answer to Fieldwood's Second Verified Claim, p. 5, para. XXVI.)

> **RESPONSE:** Admitted.

40.     The GJR Brokerage Agreement required GJR to obtain a waiver of subrogation on all of its insurance policies. (GJR Brokerage Agreement, para. 5, 2nd unnumbered subparagraph.)

> **RESPONSE:** The GJR Brokerage Agreement is the best evidence of its terms.  Excess Underwriters deny Item 39 to the extent it improperly characterizes alleged obligations under the Brokerage Agreement.

41.     Excess Underwriters agreed to waive their rights of subrogation against Fieldwood for the Bodily Injury claims arising out of the Allision.

> **RESPONSE:** The GJR Brokerage Agreement is the best evidence of its terms.  Excess Underwriters deny Item 40 to the extent it improperly characterizes alleged obligations under the Brokerage Agreement.

### D.      The Time Charter and its Indemnity and Insurance Provisions

42.     Effective January 1, 2014, Kilgore, identified as "Owner", and Fieldwood, identified as "Charterer", executed a Master Time Charter Agreement (hereafter "Time Charter"), a true and correct copy of which is attached as Exhibit 5.

> **RESPONSE:** Admitted.

43.     Paragraph 2 of the Time Charter envisioned Kilgore acting as a broker for the vessels

Fieldwood would potentially decide in the future to charter under the terms and conditions of the

Time Charter, as follows:

> This Agreement does not obligate [Kilgore] to charter its vessels to
> [Fieldwood], nor does it obligate [Fieldwood] to hire any vessel or
> vessels owned, brokered, or chartered by [Kilgore], but it, together
> with any Short Form between [Kilgore] and [Fieldwood] dated
> subsequent to the Effective Date, shall govern the respective rights
> and duties of [Kilgore] and [Fieldwood] with respect to the charter
> of [Kilgore's] vessels by [Fieldwood].

(Exh. 1, Time Charter, pp. 1 - 2, para. 2.)

**RESPONSE:** As a written document, the Time Charter is the best evidence of its contents.

44.     Paragraph 25 of the Time Charter provided, in relevant part: "This Agreement shall be

governed by and the relations between the Parties determined in accordance with the general

maritime law of the United States, not including any of its choice of law rules that would direct or

refer to the laws of another jurisdiction." (Id., para. 25.)

**RESPONSE:** As a written document, the Time Charter is the best evidence of its contents.

### 1.   The Time Charter's Indemnity Provisions.

45.     The Rodi Entities' claims against Fieldwood are based on the reciprocal indemnity

provisions of the Time Charter, as follows:

> [Fieldwood] HEREBY AGREES TO RELEASE, INDEMNIFY,
> PROTECT, DEFEND, AND HOLD HARMLESS OWNER
> GROUP FROM AND AGAINST ANY AND ALL CLAIMS
> ARISING OUT OF OR RELATED TO (1) THE INJURY,
> ILLNESS, OR DEATH OF ANY MEMBER OF CHARTERER
> GROUP ..., WITHOUT REGARD TO WHETHER ANY SUCH
> INJURY, ILLNESS OR DEATH ... IS CAUSED, IN WHOLE OR
> IN PART, BY THE NEGLIGENCE (WHETHER SOLE, JOINT
> OR CONCURRENT; ACTIVE OR PASSIVE), STRICT
> LIABILITY, STATUTORY LIABILITY, CONTRACTUAL
> LIABILITY, BREACH OF WARRANTY OR OTHER FAULT
> (EXCLUDING ONLY THE GROSS NEGLIGENCE OR

> INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE
> OWNER GROUP OR BY ANY DEFECT OR PRE-EXISTING
> CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT,
> LATENT OR OTHERWISE) OR UNSEAWORTHINESS OF THE
> VESSEL.

(Exh. 1, Time Charter, para. 12(b)(ii).)

    **RESPONSE:** As a written document, the Time Charter is the best evidence of its contents.

46.    Paragraph 12(a)(iii) of the Time Charter defined "Owner Group" to include "the [M/V

WILDCAT] and its owners and operators, and its and their respective contractors of any tier".

(*Ibid.*, para. 12(a)(iii).)

    **RESPONSE:** As a written document, the Time Charter is the best evidence of its contents

### 2.  The Time Charter's insurance provisions.

47.    The Rodi Entities have also alleged entitlement to insurance coverage under Fieldwood's

insurance policies, although they have not named Fieldwood's insurers as parties to this litigation

    **RESPONSE:** Admitted.

48.    Paragraph 11(c) of the Time Charter provided for the extension to Owner Group of certain

benefits under Fieldwood's insurance policies, "but only for and to the extent of the indemnities

and liabilities assumed by" Fieldwood, as follows:

> The Commercial General Liability Insurance policy shall name
> Owner Group as additional insureds but only for and to the extent
> of the indemnities and liabilities assumed by [Fieldwood]
> hereunder. The underwriters of all insurance policies required of
> [Fieldwood] hereunder shall waive their rights of subrogation
> against Owner Group and their respective insurers but only for and
> to the extent  of the indemnities and liabilities assumed by
> [Fieldwood] hereunder. Only for  and to the extent of the
> indemnities and liabilities assumed by [Fieldwood] herein, the
> insurance policies required under this Agreement and any other
> property, casualty or liability insurance policies of [Fieldwood] in
> any way providing coverage related to this Agreement, whether or
> not such policies are required by this Agreement, are to be endorsed
> to delete the "other insurance provisions" of [Fieldwood's]

> insurance policies and to provide that all of [Fieldwood's] policies
> are to be primary insurance.

(*Ibid*, para. 11(c)) (emphasis added).

> **RESPONSE:** As a written document, the Time Charter is the best evidence of its contents

### E.   The Limits of Coverage Provided by the MGL Policy, the Excess Policy and GJR's Primary P&I Policy

49.   Prior to its dismissal from this suit, Munich Re had exhausted its $1 million limits of coverage under its primary marine protection and indemnity policy ("Primary P&I Policy") through payment of settlements, attorney's fees, the costs of suit and expenses of investigation. (Declaration of Charlies Hann, Claims Adjuster for Munich Re, paras. 10-11, a copy of which is attached as Exhibit 6.)

> **RESPONSE:** Admitted, upon information and belief.

50.   The limits of the Primary P&I Policy were $1 million, subject to a deductible of $15,000.00. (*Id*., paras. 8 & 10.)

> **RESPONSE:** Admitted.

51.   The settlements funded by the Primary P&I Policy included the master and all crewmembers of the WILDCAT as well as all the passengers, except for Antonio Smith. (*Id*., para. 12.)

> **RESPONSE:** Admitted.

52.   After exhaustion of the limits of the Primary P&I Policy, Antonio Smith's claims were the sole remaining personal injury claim against GJR and Management.

> **RESPONSE:** Admitted.

53.   The MGL Policy had policy limits of $1 million, subject to a deductible of $5,000.00, inclusive of attorney's fee and defense costs. (Exh. 3, MGL Policy, Declarations, p. 1.)

> **RESPONSE:** Admitted.

54.     The Excess Policy had policy limits of $15 million, excess of underlying limits. (Exh. 4,

Excess Policy, Risk Details, p. 5)

    **RESPONSE:**  Admitted.

55.     Both the Primary P&I Policy and the MGL Policy were listed as underlying insurances on

the Excess Policy, each with policy limits of $1 million. (*Id*., p. 39.)

    **RESPONSE**:  Admitted.

56.     Excess Underwriters and Navigators' contributions to the funding of the confidential

settlement of Antonio Smith's claims were within the policy limits of both of those respective

policies.

    **RESPONSE**:  Admitted.

                                Respectfully submitted,

                                CERTAIN UNDERWRITERS AT LLOYDS,
                                LONDON AND NAVIGATORS INSURANCE
                                COMPANY

                    BY:     */s/ Kyle Moran*
                                Kyle Moran (Bar No. 33611)
                                Katherine Wyly (Bar No. 36737)
                                PHELPS DUNBAR LLP
                                Canal Place | 365 Canal Street, Suite 2000
                                New Orleans, Louisiana 70130-6534
                                Telephone: 504-566-1311
                                Telecopier: 504-568-9130
                                Email: kyle.moran@phelps.com
                                        katherine.wyly@phelps.com