## UNITED STATE DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF RODI MARINE, LLC, AS OWNER AND OPERATOR OF THE M/V WILDCAT, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILTIY | C.A. NO. 2:17-CV-5394-GGG-MBN<br><br>JUDGE GUIDRY<br><br>MAGISTRATE JUDGE NORTH |

### EXCESS UNDERWRITERS' RESPONSE TO FIELDWOOD'S STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT TO LIMIT RECOVERY OF THE RODI ENTITIES TO THEIR DEDUCTIBLE

Certain Underwriters at Lloyd's, London and Navigators Insurance Company subscribing to Policy Number TMU-407507 (collectively "Excess Underwriters") respond as follows to Fieldwood Energy, LLC's Statement of Uncontested Facts in support of its Motion for Partial Summary Judgment to Limit The Recovery of The Rodi Entities To Their Deductible.[1]

### A.    The GJR Brokerage Agreement and its Insurance Provisions

1.    On May 10, 2015, GJR, identified as "Operator", and Kilgore, identified as "Broker" executed the GJR Brokerage Agreement, a true and correct copy of which is attached as Exhibit 1.

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a writ ten document, is the best evidence of its contents.

---

[1] ECF 189.

2.      Pursuant to the GJR Brokerage Agreement, GJR appointed Kilgore as GJR's agent for obtaining charters or similar work contracts for GJR's vessel, the M/V WILDCAT. (Exh. 1, Brokerage Agreement, p. 1, art.1.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

3.      As set forth in the GJR Brokerage Agreement, Kilgore acted at all times as the broker of the M/V WILDCAT. (Exh. 1, Brokerage Agreement, p. 1, art.1.)

**RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

4.      The purpose of the GJR Brokerage Agreement was to use the WILDCAT, a vessel, as a crew vessel especially for Fieldwood. (Deposition of Kilgore Vice President, Andrew Louis Naquin, hereafter "Naquin depo.", p. _____, excerpts of which will be filed as Exhibit 2, and attached to an identical Supplemental Statement of Uncontested Facts with the appropriate page numbers when the certified copy of the deposition is received by Fieldwood.)

**RESPONSE:**  Admitted.

5.      The WILDCAT played a substantial role in the completion of the GJR Brokerage Agreement. *(Id.,* p. _____.)

**RESPONSE:** Admitted, upon information and belief.

6.      All of Kilgore's brokerage agreements were contracts relating to the vessels to be used as a vessel for purposes of Kilgore's customers. *(Id.,* p. _____.)

**RESPONSE:** Admitted, upon information and belief.

- 2 -

7.    Kilgore brokers three types of vessels to its customers: (1) utility boats, (2) crew boats and (3) offshore supply boats. *(Id.,* p. _____.)

   **RESPONSE:** Admitted, upon information and belief.

8.    The utility vessels that Kilgore brokered would move cargo and personnel from shore to offshore structures, and among offshore structures.

   **RESPONSE:** Admitted, upon information and belief.

9.    The purpose of the crew boats that Kilgore brokers to its customers are to move mostly personnel, but also fuel and water to and from offshore structure and shore bases, as well as among various platforms. (*Id.,* p. ____.*)

   **RESPONSE:** Admitted, upon information and belief.

10.    The offshore supply vessels that Kilgore brokers to its customers are used to carry supplies and underdeck cargo, liquid mud and drilling fluid from shore to offshore, or among various platforms offshore. *(Id.,* p.___.)

   **RESPONSE:** Admitted, upon information and belief.

11.    The term "Broker Group" was defined to include Kilgore "and any Charterer or customer for whom work was to be performed." *(Id.,* p. 1.)

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

12.    The term "Charterer" was defined to "include any customer for whom the vessel will be working." *(Id.)*

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

- 3 -

13. The M/V WILDCAT was working for Fieldwood on or about April 18, 2017, when the M/V WILDCAT allided with a platform in the Gulf of Mexico. (Doc. 83, Second Verified Claim of Fieldwood Energy LLC, hereafter "Fieldwood's Second Claim", p. 9, para. XXVI; Doc. 114, Answer to Fieldwood's Second Verified Claim, p. 5, para. XXVI.)

   **RESPONSE:** Admitted.

14. On April 17 and 18, 2017, the M/V WILDCAT was working and performing services pursuant to both the GJR Brokerage Agreement and the Time Charter. *(Ibid.)*

   **RESPONSE:** Admitted.

15. Fieldwood is a member of the Broker Group.

   **RESPONSE:** Admitted.

16. The second unnumbered paragraph of Paragraph 5 of the Brokerage Agreement contained the following unlimited and unrestricted insurance provision in favor of "Broker Group": "[GJR] further ... agrees that all members of Broker Group will be named as an additional assured(s) with waiver of subrogation on all [GJR] insurance policies." (Exh 1, GJR Brokerage Agreement, p. 3, para. 5, 2d unnum. para.)

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents.

17. The GJR Brokerage Agreement required GJR to name Fieldwood as an additional insured with waiver of subrogation on GJR's insurance policies.

   **RESPONSE:** The GJR Brokerage Agreement speaks for itself and, as a written document, is the best evidence of its contents. Fieldwood's statement offers an improper legal conclusion that is properly within the purview of the Court.

- 4 -

**B.     The "Naming" and "Waiving" Provisions of the MGL Policy**

18.    Navigators issued Policy No. HO16LIA00252402 (hereinafter "the MGL Policy") on
January 30, 2017 to Rodi Marine, L.L.C. in Lafayette, Louisiana, through Rodi's brokers also
located in Lafayette, with a policy period starting on January 1, 2017 (MGL Policy, Declarations,
p. 1 of 65, a true and correct copy of which is attached as Exhibit 3.)

        **RESPONSE:** Admitted.

19.    The MGL Policy was delivered in Louisiana.

        **RESPONSE:** Admitted, upon information and belief.

20.    The WILDCAT was listed on the Schedule of Vessels. (MGL Policy, Schedule of Vessels,
p. 35 of 65.)

        **RESPONSE:** Admitted.

21.    GJR and Management are listed as an Additional Named Assured. (MGL Policy, Additional
Named Assured Endorsement, p. 60 of 65.)

        **RESPONSE:** Admitted.

22.    The MGL Policy had policy limits of $1 million and a deductible of $5,000.00. (MGL
Policy, Declarations, p. 1 of 65.)

        **RESPONSE:** Admitted.

23.    The MGL Policy contained the following Blanket Additional Assured and Blanket Waiver
of Subrogation Endorsement:

  I.      Section II - Who is An Assured is amended to include as an additional assured any
          person or organization to whom the Named Assured is obligated by virtue of a
          written contract or agreement to provide insurance such as is afforded by this policy
          or who is added by endorsement, but only with respect to liability arising out of
          your work.

  II.     The following is added to Paragraph 9. Transfer of Rights Of Recovery Against
          Others to Us of Section IV — Conditions:

- 5 -

> We waive any right of recovery we may have against the person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization for whom the Named Assured is required to waive subrogation.
>
> This waiver of subrogation will apply only when the waiver is issued prior to an "occurrence."

(MGL Policy, p. 64 of 65, Blanket Additional Assured and Blanket Waiver of Subrogation Endorsement.)

**RESPONSE:** The MGL Policy is a written document and is the best evidence of its terms and conditions.

24. The Allision occurred on April 18, 2017, after the May 10, 2015, date of the GJR Brokerage Agreement and after the January 1, 2017, inception date of the MGL Policy.

**RESPONSE:** Admitted.

25. By operation of the GJR Brokerage Agreement and the Blanket Additional Assured and Blanket Waiver of Subrogation Endorsement of the MGL Policy, Fieldwood qualifies as an additional assured on the MGL Policy.

**RESPONSE:** Denied. The GJR Brokerage Agreement and the MGL Policy speak for themselves, and, as written documents, are the best evidence of their contents. Fieldwood's statement offers improper legal conclusions that are properly within the purview of the Court.

26. Furthermore, the GJR Brokerage Agreement and the foregoing endorsement required Navigators to waive its rights of subrogation against Fieldwood.

**RESPONSE:** Denied. The GJR Brokerage Agreement and the MGL Policy speak for themselves, and, as written documents, are the best evidence of their contents. Fieldwood's statement offers improper legal conclusions that are properly within the purview of the Court.

**C.      The "Naming" and "Waiving" Provisions of the Primary P&I Policy**

27.      Munich Re issued Policy No. TRM-407508 (hereafter "the Primary P&I Policy") on

January 9, 2017 to Rodi Marine, L.L.C. in Lafayette, Louisiana, through Rodi's brokers also

located in Lafayette, with a policy period starting on January 1, 2017. (Primary P&I Policy,

Declarations, p. 1 of 50, a true and correct copy of which is attached as Hann Exhibit A to the

Declaration of Munich Re Claims Adjuster, Charlie Hann, hereafter "Hann decl.", a copy of which

is attached as Exhibit 4.)

    **RESPONSE:** Admitted.

28.      The WILDCAT was listed on the Schedule of Vessels. (Hann decl., para. 6; Primary P&I

Policy, Schedule of Vessels, p. 39 of 50.)

    **RESPONSE:** Admitted.

29.      GJR and Management are listed as Assureds. (Hann decl., para. 6; Primary P&I Policy, Risk

Details, p. 3 of 50.)

    **RESPONSE:** Admitted.

30.      The Primary P&I Policy contained the following definitions of "Covered Party" and

    "Additional Assureds":

    **PART A — INSURING TERMS**

                                              **\* \* \***

        2.     Covered Party/Parties

                2.1 The term "Covered Party" or "Covered Parties" shall mean the
                    Named Insured and/or any legal entities or individuals added as
                    Additional Insured(s) to the Policy pursuant to Paragraph 3
                    below.

                2.2 All terms and conditions of the SP-23 form applicable to the
                    "Assured" shall apply to each Covered Party.

        3.     Additional Insureds

                                              - 7 -

3.1 We agree that, if required by "insured contract", any person, firm or organization is included as an additional insured but only with respect to "bodily injury" and/or "property damage" arising out of operations performed by the Named Insured but only to the extent required under said "insured contract".

3.2 The words "Insured Contract", wherever used in this Policy, shall mean any written contract entered into by the "Insured" where the "Insured" assumes the tort liability of another party to pay for "Bodily Injury" or "Property Damage" to which this Policy applies to a "Third Party". Tort liability means liability that would be imposed by law in the absence of any written contract. Written contract includes any written indemnity agreement entered into by the "Insured" with a "Third Party".

(Hann decl., para. 9; Primary P&I Policy, U.S Protection and Indemnity Rider Clauses, p. 13 of

50, paras. 2 & 3.)

**RESPONSE:** The Primary P&I Policy speaks for itself and, as a written document, is the

best evidence of its contents.

31.    The Primary P&I Policy also contained the following blanket waiver of subrogation

provision:

4.    Blanket Waiver of Subrogation

4.1    We agree to waive our rights of subrogation against any principal where waiver is required by written contract but only in respect of liability for Bodily Injury and/or Property Damage arising out of operations performed by you the named Insured and only to the extent required under said written contract.

(Hann decl., para. 9; Primary P&I Policy, U.S Protection and Indemnity Rider Clauses, p. 13 of

50, para. 4.)

**RESPONSE:** The Primary P&I Policy speaks for itself and, as a written document, is the

best evidence of its contents.

PD.28759174

32.     The Primary P&I Policy had a $15,000 deductible. (Hann decl., para. 8; Primary P&I Policy, Risk Details, p. 3 of 50.)

    **RESPONSE:** Admitted.

33.     The amounts of the initial fees and costs of the attorneys and investigators as well as the payments of the confidential settlement with James Hammond exceeded the $15,000 deductible under the Primary P&I Policy. (Hann decl., para. 11.)

    **RESPONSE:** Admitted, upon information and belief.

34.     The Primary P&I Policy had $1 million policy limits. (Hann decl., para. 10; Primary P&I Policy, Risk Details, p. 3 of 50.)

    **RESPONSE:** Admitted.

35.     The policy limits were reduced by investigator expenses and attorney's fees, among other enumerated costs and expenses of litigation. (Hann decl., para. 9; Primary P&I Policy, U.S Protection and Indemnity Rider Clauses, p. 14 of 50, para. 6.2.)

    **RESPONSE**: Admitted.

36.     Prior to its dismissal from this suit, Munich Re had exhausted its $1 million limits of coverage under the Primary P&I Policy through payment of settlements, attorney's fees, the costs of suit and expenses of investigation. (Hann decl., paras. 10-11.)

    **RESPONSE:** Admitted.

### D.     The "Naming" and "Waiving" Provisions of the Excess Policy

37.     Certain Underwriters at Lloyd's, London and Navigators Insurance Company (hereafter collectively "Excess Underwriters") issued Cover Note TRM-407507, on January 9, 2017 to Rodi Marine, L.L.C. in Lafayette, Louisiana, through Rodi's brokers also located in Lafayette, with a

- 9 -

policy period starting on January 1, 2017. (Cover Note TRM-407507, hereafter "Excess Policy",

Cover Sheet, p. 1 of 40, a true and correct copy of which is attached as Exhibit 5.)

**RESPONSE:** Denied as stated. Excess Underwriters subscribed to the Excess Policy, but

it was issued through Rodi's brokers.

38.    The Excess Policy was delivered in Louisiana.

**RESPONSE:** Admitted.

39.    Similarly, the Excess Policy contained the following Choice of Law & Jurisdiction

provision: "In case of any dispute arising out of this insurance, the same shall be governed by and

construed in accordance with Louisiana law and practice, jurisdiction subject to Institute Service

of Suit Clause." *(Id.,* Choice of Law & Jurisdiction, p. 6 of 40.)

**RESPONSE:** Admitted.

40.    The WILDCAT was listed on the Schedule of Vessels. *(Id.,* Schedule of Vessels, p. 40 of

40.)

**RESPONSE:** Admitted.

41.    GJR is named as an Assured on the Risk Details. *(Id.,* Risk Details, p. 5 of 40.)

**RESPONSE:** Admitted.

42.    According to the definition of "Insured" discussed further below, Item 1 of the Declarations

lists the Name and Address of the Named Insured "As per Risk Details". *(Id.,* Declarations, p. 8

of 40.)

**RESPONSE:** Admitted.

43.    Accordingly, GJR is a Named Insured and thus an "Insured" under the Excess Policy.

**RESPONSE:** Admitted.

- 10 -

44.     The Excess Policy's definition of "Insured" includes additional insureds where required by written contract, as follows:

> 13. INSURED
>
>> The word "Insured", wherever used in this Policy, shall mean only the following:
>>
>> (a) the named "Insured" set out in Item 1 of the Declarations
>>
>> *   *   *
>>
>> (d) any person or organization, other than the named "Insured", included as an additional insured in the policies listed in Item 2 of the Declarations but not for broader coverage than is available to such person or organization under such underlying policies;

*(Id.,* § IV (13), p. 25 of 40.)

**RESPONSE:** Denied as stated. The definition of "Insured" cited by Fieldwood is incomplete.   As discussed more thoroughly in Excess Underwriters' Motion for Summary Judgment, the Excess Policy also defines an "Insured," in part as, "any person or entity to whom the "Insured" is obliged by a written "Insured Contract" entered into before any relevant "Occurrence", to provide insurance such as is afforded by this Policy but only with respect to: (i) liability arising out of operations conducted by the named "Insured" or on its behalf; or (ii) facilities owned or used by the named "Insured" … (See the Excess Policy, ECF 187-3, at p. UW11.)  As discussed more fully in Excess Underwriters' Motion for Summary Judgment, Excess Underwriters dispute that the Brokerage Agreement is an "Insured Contract."

45.     Item 2 of the Declarations identifies the Underlying Insurance(s) "AS PER SCHEDULE ATTACHED". *(Id.,* Declarations, p. 8 of 40.)

**RESPONSE**: Admitted.

46.     The Schedule of Underlying Insurances includes Navigators' Marine General Liability

Policy No. HO17LIA00252401, in other words, the MGL Policy discussed in § II(B), *supra. (Id.,*

Declarations, p. 39 of 40.)

      **RESPONSE:** Admitted.

47.     Accordingly, because Fieldwood qualifies as an additional assured on the MGL Policy, as

well as the Primary P&I Policy, Fieldwood also is included as an "Insured" on the Excess Policy.

      **RESPONSE:** Denied.   Item 47 is a proposed legal conclusion, not a statement of fact.   Excess

Underwriters deny that Fieldwood is an additional assured under the Primary P&I Policy, the MGL

Policy or the Excess Policy for the reasons stated in Rodi's Response to Fieldwood's Motion for

Summary Judgment (ECF 193), and all other terms, conditions, limitations, and exclusions

relevant to Fieldwood's claim.   Additionally, for the reasons discussed more thoroughly in Excess

Underwriters' Motion for Summary Judgment, Fieldwood also is not an additional insured under

the Excess Policy *via* the underlying agreements, including the Brokerage Agreements, because

they are not "Insured Contracts" as defined by the Excess Policy.  (ECF 187-3, at UW25-26).

48.     The Excess Policy also contains the following waiver of subrogation endorsement:

> Insurers agree to waive their rights of subrogation against any principal where
> waiver is required by written contract but only in respect of liability for Bodily
> Injury and/or Property Damage arising out of operations performed by the Named
> Assured and only to the extent required under said written contract.

*(Id.,* Waiver of Subrogation Endorsement, p. 34 of 40.)

      **RESPONSE:** Admitted.

49.     On April 17 and 18, 2017, the M/V WILDCAT was working and performing services

pursuant to both the GJR Brokerage Agreement and the Time Charter. (Doc. 83, Second Verified

Claim of Fieldwood Energy LLC, hereafter "Fieldwood's Second Claim", p. 9, para. XXVI; Doc.

114, Answer to Fieldwood's Second Verified Claim, p. 5, para. XXVI.)

- 12 -

**RESPONSE:** Admitted.

50.     The GJR Brokerage Agreement required GJR to obtain a waiver of subrogation on all its insurance policies. (GJR Brokerage Agreement, para. 5, 2nd unnumbered subparagraph.)

**RESPONSE:**   The GJR Brokerage Agreement is the best evidence of its terms.   Excess Underwriters deny Item 50 to the extent it improperly characterizes alleged obligations under the Brokerage Agreement.

51.     Excess Underwriters agreed to waive their rights of subrogation against Fieldwood for the Bodily Injury claims arising out of the Allision.

**RESPONSE:**   The GJR Brokerage Agreement and Excess Policy are the best evidence of their terms.   Excess Underwriters deny Item 51 to the extent it improperly characterizes alleged obligations under the Brokerage Agreement.

   **E.**  **The Deductible Paid by the Rodi Entities.**

52.     The Primary P&I Policy was subject to a deductible of $15,000.00. (Hann decl., para. 8.)
   **RESPONSE:** Admitted.

53.     That $15,000 deductible was exceeded by the confidential settlement of the personal injury claims of James Hammond, and the expenses of investigation and attorney's fees. (Hann decl., para. 11.)

   **RESPONSE:** Admitted.

54.     The MGL Policy had a $5,000.00 deductible which likewise was consumed by the foregoing payments towards settlement, investigation and attorneys. (MGL Policy, Declarations, p. 1 of 50.)

   **RESPONSE:** Excess Underwriters deny for lack of information or belief.

55.     In accordance with the Primary P&I Policy, Munich Re funded the settlements of the claims of the master and all crewmembers of the WILDCAT as well as all the passengers, except for Antonio Smith. (Hann decl., para. 12.)

**RESPONSE:** Admitted.

56.     Additional payments towards investigation and attorney's fees ultimately exhausted the $1 million limits of the Primary P&I Policy. *(Id.)*

**RESPONSE:** Admitted.

57.     After exhaustion of the limits of the Primary P&I Policy, Antonio Smith's claims were the sole remaining personal injury claim against GJR and Management.

**RESPONSE:** Admitted.

58.     The MGL Policy had policy limits of $1 million. (Exh. 2, MGL Policy, Declarations, p. 1.)
**RESPONSE:** Admitted.

59.     The Excess Policy had policy limits of $15 million, excess of underlying limits. (Exh. 2, Excess Policy, Risk Details, p. 5).

**RESPONSE:** Admitted.

60.     Excess Underwriters and Navigators' contributed to the funding of the confidential settlement of Antonio Smith's claims.

**RESPONSE:**     Admitted in part. Fieldwood's statement is incomplete.  As discussed in Excess Underwriters' response to Fieldwood's motion for summary judgment (ECF 195) and as memorialized in the official Court transcript from the settlement conference held on December 17, 2019, Fieldwood's insurers also contributed to the settlement of Antonio Smith's claim.

- 14 -

61.    Neither Rodi Marine, L.L.C., GJR or Management contributed any funds to the settlement

of Antonio Smith's claims.

   **RESPONSE:** Admitted.

                              Respectfully submitted,

                              **CERTAIN UNDERWRITERS AT LLOYDS,
                              LONDON AND NAVIGATORS INSURANCE
                              COMPANY**

                       BY:    */s/ Kyle Moran*
                              Kyle Moran (Bar No. 33611)
                              Katherine Wyly (Bar No. 36737)
                              PHELPS DUNBAR LLP
                              Canal Place | 365 Canal Street, Suite 2000
                              New Orleans, Louisiana 70130-6534
                              Telephone: 504-566-1311
                              Telecopier: 504-568-9130
                              Email: kyle.moran@phelps.com
                                    katherine.wyly@phelps.com